**Ex Parte Gregory VAN ALSTYNE, Applicant.**

No. AP–75795.

Court of Criminal Appeals of Texas.

Nov. 14, 2007.

David R. Dow, Houston, for Appellant.

Jeffrey L. Van Horn, State's Atty., Austin, for State.

## *OPINION*

PER CURIAM.

This is a subsequent application for writ of habeas corpus in a capital case, in which the applicant claims that he cannot be subjected to the death penalty, consistent with *Atkins v. Virginia,*[1] because he is mentally retarded.  This Court found that the application satisfied the requirements for a subsequent writ under Article 11.071, Section 5, and remanded the cause to the convicting court for further proceedings.

1.  536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d   335 (2002).

The convicting court held an evidentiary hearing in late August of 2005, after which it made recommended findings of fact and conclusions of law, recommending that the applicant's sentence be reduced to life imprisonment because he is mentally retarded and therefore cannot be executed consonant with the Eighth Amendment's ban on cruel and unusual punishment. After our own independent review of the record, we will follow that recommendation.

## THE LEGAL STANDARD

For purposes of *Atkins* review in Texas, we have defined mental retardation to be "1) significant sub-average general intellectual functioning, usually evidence by an IQ score below 70, that is accompanied by, 2) related limitations in adaptive functioning, 3) the onset of which occurs prior to the age of 18." [2] In post-conviction habeas corpus review, this Court is the ultimate fact finder.[3] Nevertheless, the convicting court is the "original factfinder" in post-conviction habeas corpus proceedings,[4] and as a matter of course this Court pays great deference to the convicting court's recommended findings of fact and conclusions of law, as long as they are supported by the record, particularly in those matters with regard to the weight and credibility of the witnesses and, in the case of expert witnesses, the level and scope of their expertise.[5]

In cases in which the evidence could support both a finding that the habeas applicant has shown by a preponderance of the evidence that he is mentally retarded and a finding that he has *failed* to show he is mentally retarded to that level of confidence, we have typically deferred to the recommendation of the convicting court, whatever that might be.[6] In the instant case, the convicting court has considered records from the Texas Department of Criminal Justice (TDCJ) and affidavits from various experts and lay people and has conducted an evidentiary hearing. It has recommended, based upon conflicting evidence, that we find that the applicant has demonstrated to the requisite level of confidence that he is mentally retarded.[7] We see no compelling reason to reject that recommendation.

2. *Ex parte Blue*, 230 S.W.3d 151, 163 (Tex. Crim.App.2007). *See also Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex.Crim.App.2004); *Ex parte Modden*, 147 S.W.3d 293, 296 (Tex. Crim.App.2004); *Howard v. State*, 153 S.W.3d 382, 386 (Tex.Crim.App.2004).

3. *Ex parte Adams*, 768 S.W.2d 281, 288 (Tex. Crim.App.1989); *Ex parte Brandley*, 781 S.W.2d 886, 887–88 (Tex.Crim.App.1989).

4. *Ex parte Simpson*, 136 S.W.3d 660, 669 (Tex.Crim.App.2004).

5. *See Ex parte Rodriguez*, 164 S.W.3d 400, 405 n. 5 (Tex.Crim.App.2005) (Cochran, J., concurring); *Ex parte Lewis*, 223 S.W.3d 372, 374 n. 4 (Tex.Crim.App.2006) (Cochran, J., concurring).

6. *E.g., Ex parte Rodriguez, supra; Ex parte Lewis, supra; Ex parte Bell*, 152 S.W.3d 103 (Tex.Crim.App.2004); *Ex parte Valdez*, 158 S.W.3d 438 (Tex.Crim.App.2004).

7. Indeed, in its recommended findings of fact and conclusions of law, the convicting court concluded that the applicant had met all three of the criteria for mental retardation to a level of confidence *beyond a reasonable doubt.* This is so even though the convicting court had earlier declared, on the first page of its recommended findings and conclusions, that "[a]ll findings here are based upon a preponderance of the evidence[.]" We express no opinion with respect to whether the applicant has indeed proven mental retardation beyond a reasonable doubt, but note that a finding sufficient to satisfy this level of confidence would, *a fortiori*, demonstrate a finding by a preponderance of the evidence, which is the standard applicable to a showing of mental retardation in the habeas corpus context. *See Ex parte Briseno, supra*, at 12.

## APPLICATION OF LAW TO FACTS

### Significant Sub–Average Intellectual Functioning

■ Born in 1966, the applicant has had his IQ tested via various psychometric instruments at least six times between 1989 and 2003. Each time he scored in the range of mild mental retardation. During his first incarceration in TDCJ, beginning in 1989, his full-scale score on the Wechsler Adult Intelligence Scales–Revised was a 69. Other standardized tests conducted by the prison system also placed the applicant in the mild mental-retardation range. Fourteen years later, on November 1, 2003, the applicant's own expert, Dr. Antolin Llorente, obtained an identical full-scale score when he administered the Wechsler Abbreviated Scale of Intelligence to the applicant. Ten days later, on November 11, 2003, the State's expert, Dr. David Edgerton, administered the Wechsler Adult Intelligence Scale–IV to the applicant, obtaining a full-scale score of 56. Edgerton testified that the discrepancy in the results he obtained caused him some concern about the possibility of malingering on the applicant's part, but admitted that he had administered none of the available instruments that are designed to help detect malingering.[8] He conceded that the evidence that the applicant had presented would support a finding that the applicant's IQ scores fall within the range of mild mental retardation.[9] Thus, the record amply supports the convicting court's finding that the applicant has demonstrated to the requisite level of confidence that he has significant sub-average intellectual functioning and therefore satisfies the first criteria for mental retardation.

### Adaptive Deficits/Age of Onset

■ Unlike the question of the applicant's IQ, the question whether he manifests adaptive deficits was hotly contested. The applicant relied primarily upon an affi-

8. As the convicting court noted in its recommended findings, when Dr. Llorente tested the applicant's IQ on November 1, 2003, he apparently *did* administer tests to assess the possibility of that the applicant was malingering. "The results of these procedures revealed that [the applicant] was being straightforward in his responses to test items." Thus, regardless of whether the applicant may have been malingering in an attempt to obtain a lower score ten days later with Dr. Edgerton, the test results obtained by Llorente, placing the applicant within the range of the mildly mentally retarded, remain valid.

9. Under questioning by the State, Edgerton testified with respect to the first component of the diagnosis for mental retardation:

    Q. Did you, in looking at everything, the testing from the prison, the testing with defense counsel and your personal observations, et cetera, do you have an opinion as to approximately where the defendant's true IQ or these testing procedures probably fell?

    A. It is my opinion that he does not fall in the moderate range at all. If there is mental retardation or if there are scores in that range, it would be in the high, mild range. I would say high, mild retarded, low, medium borderline.

    Q. The 69 score that the defense doctor got clearly fits with what you see with regard to this defendant?

    A. Yes.

    Q. And again, of necessity, we talk about this is the mental retardation IQ range, but that does not mean he was mentally retarded, agreed?

    A. Agreed. It does not mean that.

    Q. So we are not going to take issue with the 69. . . .

    Later the State returned to this line of questioning:

    Q. The—I also want to talk about again the IQ test. I want to make it clear. We are not contesting where his IQ level falls, are we?

    A. No.

    Q. You agree with basically the about 69 overall in there?

    A. Yes.

davit and report from Dr. Richard Garnett. Dr. Garnett conducted a three-hour clinical interview with the applicant, from which he concluded that the applicant's thinking is highly concrete, and his ability to reason abstractly, impaired.[10] After reviewing, *inter alia*, 1) evidence from the punishment phase of the applicant's trial, 2) affidavits from family members who grew up with and around the applicant in the Philippines, 3) affidavits of various benefactors who helped him once he came to the United States, 4) social-security records outlining his sketchy employment record, and 5) prison records, Garnett opined that the applicant "has exhibited a life-long pattern of substandard functioning in all areas of daily living: conceptual, social, and practical." He concluded that the applicant "has indeed demonstrated significant deficits in adaptive functioning."

The record supports this conclusion with anecdotal and documentary evidence from various sources that the applicant, *inter alia:*

- was born a "blue baby" with the umbilical cord around his neck
- was developmentally slow as a child, walking for the first time at the age of two and talking for the first time at four

- suffered a head injury and was struck by lightening as a child
- did extremely poorly in school in the Philippines
- displayed grossly deficient personal hygiene and table manners
- could not be taught, once he came to the United States, how to perform relatively simple tasks such as operating a washing machine, mowing the lawn, or driving a car, and never obtained a driver's license
- could not find his way around the city, could not cook for himself, ate spoiled food, did not understand the value of, or how to manage, money, and apparently did not know how to pay bills
- could not find a job on his own, and could not keep even menial jobs that someone else helped him find for more than five weeks at a time, earning less than $1500 over the course of two years
- once he no longer lived with a benefactor, could not live on his own for more than a few weeks at a time without getting into serious trouble and going to prison.

Even the State's expert, Dr. Edgerton, acknowledged at the evidentiary hearing that this record, if reliable, would support a diagnosis of mental retardation.[11]

**10.** Dr. Garnett concluded:

In sum, [the applicant] exhibits a level of thinking that is extremely concrete. He lacks the ability to extrapolate or think abstractly. Individuals who exhibit impairments in understanding, reasoning, and thought process like [the applicant] are unable to adequately manage the demands of day-to-day functioning.

**11.** At the conclusion of his cross-examination, Edgerton agreed that the applicant's evidence "could be interpreted" to support a diagnosis of mental retardation. Later, on re-cross-examination, he specifically acknowledged that there was evidence in the record to show

adaptive deficits in the applicant's conceptual, social, and practical skills. Ultimately, he testified:

Q. [The Prosecutor] asked you a question at the beginning of his redirect whether you had changed your mind about certain things. I would like to ask you a question. Have you changed your mind about your statement to me at the end of my cross-examination that there is evidence in the record now supported by independent corroborating evidence in the punishment phase of this trial, that would support a diagnosis that [the applicant] has mild mental retardation?

A. My opinion is still that he had—

The State took the position at the evidentiary hearing that the affidavits supporting Dr. Garnett's conclusion with respect to adaptive deficits were *not* reliable. Edgerton pointed to internal inconsistencies within individual affidavits as well as inconsistencies among the various affidavits and concluded that there was a significant danger of exaggeration from the informants. He noted that, although the applicant's 1989 IQ tests had prompted the prison system to evaluate him for special services, TDCJ had ultimately concluded, on the basis of further evaluation, including administration of the Vineland test for adaptive deficits, that he could function adequately in the regular prison population.[12] Edgerton believed that the data more closely supported a diagnosis of conduct disorder and concluded that the applicant did not manifest a sufficient level or breadth of adaptive dysfunction to ultimately justify a diagnosis of mild mental retardation.

The applicant countered with evidence that the TDCJ evaluation itself was unreliable because the data underlying the Vineland score had originated with the applicant himself, rather than from knowledgeable third-party sources as is the standard protocol. It was documented that much of the information that the applicant had supplied to the TDCJ evaluators inaccurately overstated his adaptive abilities. For example, the applicant had told the evaluators that he had graduated from an apparently non-existent high school, that he had been an "A" student, that he had spent three months in the Marine Corps when in fact there is no record of any military service, and that he had been employed as a commercial truck driver when in fact he had never had a driver's license. Moreover, the applicant established that, even if he could be diagnosed with conduct disorder (which Edgerton did not purport to do, testifying only that he thought it probable that a full work-up would result in that diagnosis), such a diagnosis would not exclude a concurrent diagnosis of mental retardation.[13]

In his report, Dr. Garnett also evaluated the applicant according to the non-diagnostic criteria this Court identified in *Ex parte Briseno*.[14] The convicting court has made extensive findings with respect to these criteria. The record supports the convicting court's findings that: 1) the applicant's participation in the offense for which he is on death row was spontaneous, rather than planned;[15] 2) that his conduct

---

Q. I understand what your opinion is. My question is, do you agree with me that there is evidence in the record supported by corroborating evidence at the punishment phase of his trial in 1992, that supports the diagnosis that he has mild mental retardation?
A. Yes.
Nevertheless, Edgerton expressed the view that the evidence was more consistent with a diagnosis of conduct disorder than mental retardation, even though he also acknowledged that the two diagnoses were not mutually exclusive. *See* text, *post*.

12. The Vineland Adaptive Behavior Test is one of the recognized standardized scales for measuring adaptive deficits. *See Ex parte Blue, supra,* at 165 n. 55.

13. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders–Text Revision* (4th Ed.2000), at 47 ("The diagnostic criteria for Mental Retardation do not include an exclusion criterion; therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder.").

14. 135 S.W.3d at 8–9.

15. The applicant was convicted for the robbery/murder of a pizza-delivery man. The evidence showed that the applicant's co-defendant summoned the delivery man and then directed the applicant in disposing of the body, the automobile, and other evidence of the crime. With respect to the applicant's

in general is impulsive;[16] 3) that he is uniformly reported to be gullible and a follower rather than a leader;[17] and 4) that he was unable to lie or hide facts in his own interest.[18]

On this state of the record, the convicting court was justified in finding by a preponderance of the evidence that the applicant has established adaptive deficits over the course of his lifetime (including during the developmental period) sufficient to show he is mildly mentally retarded.

### The Media Interview

■ The dissenters disagree and would have us assert our prerogative as the ultimate (if not the original) finders of fact to reject the convicting court's recommendation. They believe that a recorded interview, approximately thirty-seven minutes long, that applicant gave to an Amarillo television reporter, conclusively demonstrates that he is not mentally retarded. As with Justice Stewart's assertion about hard-core pornography, they "know [mental retardation] when [they] see it," and the applicant "is not that[.]"[19]

The convicting court did not ignore the media interview—far from it. After the evidentiary hearing was concluded, the convicting court allowed the parties to file additional affidavits from their experts in which they assessed the significance of the applicant's performance in the recorded interview and explained how they thought it supports their respective positions with regard to whether the applicant is mentally retarded. Tellingly, however, none of the experts purported to be able to determine, based upon viewing the television interview alone, whether the applicant is mentally retarded. Indeed, we are unaware of any mental health experts who

---

participation in the actual killing, the convicting court observed:

> There are two basic versions of the facts of the killing: [the applicant's] version, i.e., that [his co-defendant] handed him a knife and said, "get the pizza man" and [the applicant] just went crazy and stabbed him; or, [the co-defendant's] version, i.e., [the co-defendant] went outside to pay the pizza man and out of nowhere [the applicant] appeared and began stomping and stabbing the pizza man. Under either scenario, [the applicant's] conduct would appear to be impulsive and not well-planned.

16. The applicant committed an earlier robbery that seemed no more well-planned than his capital offense would later prove to be. The applicant persuaded the victim to give him a ride in her car. Once in the car, he grabbed the victim's granddaughter by the neck, and threatened to kill her unless the victim gave him her money. Instead, the victim pulled into a fast-food parking lot and began to honk the horn. The applicant fled across the street to a park and hid in some bushes. Later he yelled threats at the victim and then ducked back behind the same bushes. He was soon caught. As the convicting court observed, "A well-planned robbery

this was not. Why [the applicant] would remain in the area and draw more attention to himself does not make any sense."

17. In its findings and conclusions, the convicting court quoted testimony from many of the witnesses at the punishment phase of his trial, at the evidentiary hearing, and in the affidavits, who all attested to the fact that the applicant was a follower and was easily led.

18. The convicting court accurately observed: "The evidence is quite clear that [the applicant] is capable of hiding facts or lying. However, it is equally clear that he cannot do so very effectively and certainly not in his own or other's interest? [sic] The record is replete with examples."

19. *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) ("I shall not today attempt further to define the kinds of material I understand to be embraced with that shorthand description ['hard-core pornography']; and perhaps I could never succeed in intelligibly doing so. But I know it what I see it, and the motion picture involved in this case is not that.").

purport to be able to diagnose mental retardation, or the lack thereof, based solely upon viewing a videotaped interview.

The convicting court addressed the television interview at some length in its findings of fact and conclusions of law. The convicting court regarded the interview as relevant specifically in the context of one of the *Briseno* factors, *viz:* Does the applicant respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?[20] In its recommended findings of fact and conclusions of law, the convicting court judge noted with obvious trepidation the conflicting opinions of the experts with respect to the interview. He remarked that to his untrained eye the applicant's responses did not seem "indicative of mental retardation." But he also noted that during the course of the interview the applicant did not respond in a spontaneous way to questions, but instead "just started talking." The interviewer asked few questions, testifying that for the most part she just let the applicant talk about whatever topics he chose. The convicting court not-

ed the possibility that the applicant's apparent fluidity during the interview may simply have reflected "a learned by rote understanding of his case which he [was] then able to repeat when given an opportunity" after he had spent eleven years on death row communicating with his various lawyers. Unable firmly to resolve its ambivalence with respect to this particular *Briseno* factor,[21] the convicting court ultimately relied upon the totality of the evidence as it bore upon all of the other relevant criteria to conclude that the applicant had demonstrated adaptive deficits to the requisite level of confidence.

We believe this was the right approach. Both the American Bar Association and the State Bar of Texas recognize the important role of experts in screening defendants for mental health issues, including mental retardation.[22] There is a reason that mental-health experts are important to this process; mildly mentally retarded individuals often learn to disguise their disabilities in a so-called "cloak of compe-

---

20. 135 S.W.3d at 8.

21. The convicting court concluded its discussion of the significance of the media interview with the following remarks:

> Granted, before being educated through this writ process, [the applicant's] appearance on the televised interview is not one which this court would have thought was indicative of mental retardation. As noted in *Briseno*, Steinbeck's Lenny is more what this court would think a mentally retarded individual would look and act like. Unfortunately, in this case, it is not that easy and the court must look at all the factors and not just one.

22. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases Guideline 4.1 (2003) ("The Defense Team and Supporting Services") *Commentary,* at 31 ("Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions [including mental retardation] that could be of critical importance. Accordingly, Subsection A(2) [of Guideline 4.1] mandates that at least one member of the defense team ... be a person qualified by experience and training to screen for mental and psychological disorders or defects and recommend such further investigation of the subject as may be deemed appropriate."); State Bar of Texas Guidelines and Standards for Texas Capital Counsel Guidelines 10.1(B)(2)(c) ("The Defense Team") & 12.2(B)(5)(b) ("Duties of Post–Trial Counsel") (2006) ("Habeas corpus counsel should not rely on his or her own observations of the capital client's mental status as sufficient to detect the array of conditions [including mental retardation] that could be of critical importance. For that reason, at least one member of the defense team should be qualified to screen for mental and psychological disorders or defects and recommend further investigation of the client if necessary.").

tence."[23] It is true, of course, that experts do not make the ultimate determination with respect to mental retardation; the convicting court as original fact finder makes the ultimate determination with respect to mental retardation, based upon all of the evidence and determinations of credibility.[24] Nevertheless, we cannot fault the convicting court judge for entertaining a healthy scepticism of his own ability to gauge mental retardation, *vel non*, based upon nothing more than his intuitive assessment of the appellant's performance during the media interview.

We, too, have viewed the media interview. To our untrained eye, it conclusively demonstrates neither that the applicant is mentally retarded, nor that he is not. Under the circumstances, the convicting court was justified in relying upon the expert assessment of Dr. Garnett, who has thirty-five years of professional experience as a diagnostician in the field of mental retardation. From his three-hour clinical interview of the applicant, in combination with the results of the IQ testing and his review of the other evidence of adaptive deficits summarized above, Garnett concluded that the applicant is mentally retarded. In his expert opinion, the thirty-seven-minute media interview corroborated that conclusion. Not surprisingly, Dr. Edgerton drew a different conclusion and thought that the media interview corroborated his own, contrary view. This means that the record would also support a reasonable jurist's conclusion that the applicant has *not* established mental retardation by a preponderance of the evidence. On such a state of the record, we typically defer to the recommended findings and conclusions of the convicting court—here, that the evidence preponderates in favor of a finding that the applicant is mentally retarded.

## CONCLUSION

■ The record supports the convicting court's findings of fact and conclusions of law, and, with one caveat, we adopt them.[25] Accordingly, we accept the convicting court's conclusion that the applicant has shown, by a preponderance of the evidence, that he falls within the range of mentally retarded offenders about whom there is a national consensus that they should not be executed. Relief is granted,

23. *See* Robert B. Edgerton, THE CLOAK OF COMPETENCE (rev. ed.1993). Professors Patton and Keyes have described this concept as follows:

> The term has often been cited to convey the reality that many individuals with mental retardation, when given the chance, want to "pass" as normal and shed the label of mental retardation. To accomplish this goal, these individuals will often try to hide their deficiencies and come across as much more competent than they actually are. The implications of this "cloaking" behavior can be dramatic when these individuals are interviewed or asked to complete a standardized instrument of adaptive behavior (i.e., self-report format). Thorough examination of a person's life and levels of functioning typically reveal accurate levels of functioning; however, the words and actions of an individual who is trying to look as good as he or she can sometimes can become a complicating factor in explaining adaptive functioning deficits.

James R. Patton & Denis W. Keyes, *Death Penalty Issues Following Atkins*, 14(4) EXCEPTIONALITY 237, 252 (2006). "The limited ability of most lawyers to recognize mental retardation in their clients has been well documented." James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 GEO. WASH. L.REV. 414, 493 (1985).

24. *Ex parte Briseno, supra,* at 9.

25. As noted earlier, we need not, and therefore do not, endorse the convicting court's conclusion that the applicant has proven his mild mental retardation to a level of confidence *beyond a reasonable doubt*. Implicit in that finding, however, is a finding that the applicant has shown mental retardation at least by a preponderance of the evidence. *See* note 7, *ante*.

and the applicant's sentence is reformed to a term of life imprisonment.

KELLER, P.J., filed a dissenting opinion in which KEASLER and HERVEY, JJ., joined.

KELLER, P.J., filed a dissenting opinion in which KEASLER and HERVEY, JJ., joined.

Is applicant the kind of person who is "so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus" that the death penalty should not be imposed?[1] He did not seem to be particularly impaired when he was interviewed by the television media. We are fortunate to have a video recording (including audio) of that interview, and I have reviewed it. On the recording, applicant speaks fluently. Both the content of his speech and its manner of delivery suggest a person of ordinary intelligence. His ability to engage in abstract thinking is reflected by his use of figures of speech[2] and by his explanation of the symbolism of the tear tattoo on his face. It is impossible to fully convey in writing applicant's demeanor and voice, but applicant does not appear on the video to be mentally retarded.

The news reporter felt that applicant had communicated his points well; she had no reservations about his mental capacity. Both of the State's experts expressed the opinion that the recording is evidence that applicant does not have mental retardation. Indeed, Dr. Jenkins stated, "I have never seen any mentally retarded individual communicate and interact as Gregory Van Alstyne did in the recorded television interview." The trial court itself acknowledged that "before being educated through this writ process, [applicant's] appearance on the televised interview is not one which this court would have thought was indicative of mental retardation."

We have previously addressed the effect a video recording can have on appellate review of a trial court's finding of fact where the recording clearly contradicts testimony that would otherwise support the trial court's finding. In *Carmouche v. State*, a law enforcement officer testified that the defendant had made gestures indicating his consent to a request to conduct a search.[3] The incident had been recorded on videotape, and the recording was inconsistent with the officer's rendition of events.[4] Finding that "the videotape presents indisputable visual evidence contradicting the essential portions of [the officer's] testimony," we held, "In these narrow circumstances, we cannot blind ourselves to the videotape evidence simply because [the officer's] testimony may, by itself, be read to support" the trial court's ruling.[5]

*Carmouche* suggested that it was appropriate in the situation presented to "decline to give 'almost total deference'" to the trial court's findings because the videotape evidence did "not pivot 'on an evaluation of credibility and demeanor.'"[6] In a later case, we suggested that this statement made our precedent "somewhat unclear" as to whether a deferential or *de*

---

1. *Atkins v. Virginia*, 536 U.S. 304, 317, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

2. As the trial court observed, applicant used various figures of speech such as: "fed to the lions," "thrown away like a piece of trash," "taken fast," "eaten alive," "sacrificed," and "putting things in God's hands."

3. 10 S.W.3d 323, 331–32 (Tex.Crim.App. 2000).

4. *Id.*

5. *Id.* at 332.

6. *Id.*

*novo* standard applies to a trial court's evaluation of videotape evidence in the traffic stop context.[7] Citing *Anderson v. Bessemer City,*[8] we clarified that the "almost total deference" standard of review applies.[9] In a later case, Judge Hervey explained that *Carmouche* presented an uncommon scenario that can result from the application of the deferential standard of review: "*Carmouche* illustrates how a reviewing court can overturn a lower court's ruling by considering all the evidence in the light most favorable to the ruling even when there is some evidence to support the ruling."[10] Under the appropriate circumstances, a video recording can be evidence of a compelling nature that requires that we discount testimony that conflicts with the recording.

Such would appear to be the case before us. Although applicant proffered low IQ scores, experts who opined that applicant was mentally retarded (despite the video), and other testimony suggesting adaptive deficits, the video recording starkly contradicts the picture painted by applicant's evidence.

But the Court says we should not trust what we see and hear on the video recording, because we are not experts, and because people suffering from mild mental retardation can sometimes wrap themselves in a "cloak of competence." We should also keep in mind that people who are not mentally retarded can malinger, refusing to put forth their best effort on testing and in other respects acting as if they are less intelligent than they really are. A person whose life depends on a finding of mental retardation would have an especially strong incentive to do so. Indeed, as the Court observes, one set of applicant's test scores varies widely enough from the others to suggest possible malingering. Even more telling, however, is the habeas court's own observations of applicant's conduct and demeanor at the evidentiary hearing:

> This court, based on personal observations, and prior to reading Dr. Jenkins' affidavit, was struck by the divergent appearance of Mr. Van Alstyne in the television interview contrasted to his appearance in court. At the evidentiary hearing, Mr. Van Alstyne had an extremely flat affect. He did not interact with court personnel or with his counsel, showed no emotion, and basically sat zombie-like in his seat. This is not the Gregory Van Alstyne shown in the television interview tape.[11]

And the proceedings may be especially vulnerable to malingering, when, as in this case, very little objective information is available about the applicant's life before age eighteen.[12]

It is clear that the trial court in this case carefully considered the evidence on both sides of the issue of mental retardation. The record of the hearing, and the findings of fact and conclusions of law, reflect a high degree of thoughtfulness and conscientiousness on the part of the court. And

---

7. *Montanez v. State*, 195 S.W.3d 101, 108 (Tex.Crim.App.2006).

8. 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

9. *Montanez*, 195 S.W.3d at 109.

10. *Watson v. State*, 204 S.W.3d 404, 418 n. 7 (Tex.Crim.App.2006)(Hervey, J., dissenting).

11. Nevertheless, the trial court said, "[J]ust because Mr. Van Alstyne may make an effort to act or look like what he may perceive a mentally retarded person would act or look like, does not mean that he is not retarded."

12. Applicant had emigrated to the United States from the Philippines, and the trial court lamented the absence of records for segments of his life.

perhaps a factfinding court can reasonably conclude, based on the defensive evidence offered here, that applicant can in some sense be said to be mentally retarded under the AAMR guidelines. But is applicant impaired to such a degree that a national consensus exists that he should not be subject to the death penalty? It is evident from the video recording that he is not so impaired.

Moreover, substantial evidence apart from the video recording supports the State's contention that applicant is not mentally retarded, including expert testimony and a prior determination within the prison system.[13] Even giving "almost total deference to the trial court's findings," [14] I cannot conclude that the evidence is sufficient to show that applicant is impaired to the degree necessary to exempt him from execution under *Atkins v. Virginia.*

I would deny relief. I respectfully dissent.

---

13. When asked why applicant was discharged from the Mentally Retarded Offender Program (MROP), an associate clinical psychologist for the Texas Department of Criminal Justice, Arden Kuperman–Dominey, replied, "[T]he records just indicated that they said his level of adaptive functioning was too high for their program." The MROP report stated that applicant's "intellectual functioning is in the normal range and his adaptive behavior is also normal." Kuperman–Dominey explained that, with regard to an inmate's suitability for the MROP program, "[t]hey usually have a whole list of things and their functioning on that unit," and that the sociology department would be in charge of confirming

the inmate's self-reported information. According to Kuperman–Dominey, however, the majority of records, if any, had been destroyed. Although applicant claims that the MROP determination was flawed because it was based solely upon a Vineland score derived from his self-reporting, no one really knows whether that is indeed the case, or whether the confirming records have simply been destroyed sometime between 1989, when he was evaluated, and 2006, when the evidentiary hearing was held.

14. *Hall v. State,* 160 S.W.3d 24, 36, 39 (Tex. Crim.App.2004).