

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-76,291

---

### EX PARTE JUAN MANUEL CHAVEZ, Applicant

---

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 639093 IN THE 174TH DISTRICT COURT
### FROM HARRIS COUNTY

---

KEASLER, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, PRICE, JOHNSON, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. WOMACK, J., dissented.

### O P I N I O N

Juan Manuel Chavez seeks habeas corpus relief, claiming that a State witness's testimony—that an unknown hair found where the victim was sexually assaulted was consistent with his known head-hair sample—is false based on recent DNA testing excluding him as the source of the hair. Contrary to the trial judge's findings and conclusions, we find no due process violation and deny relief.

### Background

On May 12, 1992, Lilia Martinez walked from her apartment in Southwest Houston to a nearby Apple Tree grocery store. She observed a man walking on the opposite side of the street but in the same direction. Martinez entered Apple Tree, purchased some fruit and a money order and left the store. As she began to walk back home, she noticed the same man standing in the corner of the Apple Tree parking lot. The man approached Martinez and offered to carry her bags. She declined, but the man was persistent; he followed her and kept talking to her, making some sexually-explicit comments. When they reached her apartment building, he followed her up a set of stairs while continuing to offer to carry her bags. Although the man was wearing dark sunglasses, Martinez got a good look at his face.

The man followed Martinez and was two units from Martinez's apartment when Martinez went inside. She immediately locked the door, put her bags down, and looked through her window. Martinez saw the man standing near her apartment door. She went to the kitchen, put the fruit in her refrigerator, and then went back to the window and looked out again. She did not see the man. Martinez went to the building's office and paid her rent. Because the man appeared to be gone, she thought that the coast was clear and left her door unlocked. When she returned to her apartment, she locked the door behind her. As she entered her bedroom, the man who followed her home stepped out of her closet. Martinez screamed and ran, but before she could get out of her apartment, the man knocked her to the floor.

While Martinez was on the floor, the man covered her mouth with his hand, pulled

a gun from his waistband, pointed it at her head, and told her to shut up or he would "blow [her] away." With the gun in his left hand, the man undressed Martinez with his right hand. As Martinez was laying on her back, the man forced her to preform oral sex on him. During all of this, even though the man was still wearing sunglasses, Martinez was close to him and able to get a clear look at him. Next, the man stood Martinez up and walked her into the bedroom. At this time, he was covering her mouth with his hand, and she was able to see a worn off, bluish tattoo near his wrist. Once in the bedroom, the man anally sodomized Martinez. When the man was finished, he wanted to clean himself with the bedspread. Martinez pleaded for him not to, so he used toilet paper instead. Martinez testified that she saw blood on his penis. The man took a towel from the bathroom and used it to clean the doorknobs. The man then left.

Later that day, Martinez told a friend what happened. The friend, Marta Ibarra, persuaded Martinez to notify the police. An ambulance arrived and transported her to Ben Taub Hospital. Martinez underwent a full rape examination and spoke to a police officer. The nurses and doctors who preformed the exam concluded that Martinez exhibited signs indicating that she had in fact been raped.

Less than twenty-four hours after the assault, Officer Keith Webb, a member of the Houston Police Department's (HPD) Crime Scene Unit, conducted the primary investigation of Martinez's apartment. Officer Webb started by taking photographs of Martinez's apartment. He noticed a stain on the bedspread, where the second assault had taken place.

He processed the bedspread and moved on to the southwest area of the living room, where Martinez was first assaulted. Officer Webb used multiple tape lifts to gather trace evidence like hair and fibers. When he stuck the tape to the floor and pulled it up, the tape picked up trace evidence, but he performed no actual inspection of it. Officer Webb forwarded the tape lifts for analysis by a criminalist at the HPD crime lab.

In the few days after the assault, Martinez inspected a photo array that did not contain a photograph of Chavez; Martinez did not make an identification from the array. Less than one month after the assault, Sergeant Angeli of the Houston Police Department asked Martinez to describe her assailant to a sketch artist. Because Martinez's assailant was wearing dark sunglasses during the assault, the sketch artist was forced to draw in her own version of the assailant's eyes. The description Martinez gave to the sketch artist did, however, include a thin scar on the man's right cheek, which was later determined to be consistent with a scar on Chavez's right cheek. Martinez also described her assailant as having "curly hair," a description she testified to at trial. In June 1992, a month after her assault, Martinez was shown a second photo array. This array did not contain a photograph of Chavez, and Martinez did not make an identification from this array.

Martinez saw her assailant in public on two occasions. First, in early June 1992, while Martinez and Ibarra were riding a city bus, Martinez recognized a passenger as the man who assaulted her. Both women noticed the man attempting to hide himself behind two other passengers. Martinez saw him a second time on June 19, 1992, while shopping with her

brother and Ibarra in a Fiesta Mart. The man walked by Martinez and turned to look at her twice. Martinez signaled Ibarra, and Ibarra immediately found an off-duty police officer, Officer Goode, who was moonlighting as a Fiesta security guard. At the same time, Martinez found another Fiesta security guard and told him what was going on. The security guard that Martinez alerted testified that the man pointed out to him was acting odd and appeared to be in a hurry. As soon as the man walked out of the store, Officer Goode asked him to stop. He stopped, and Officer Goode took him into custody. Officer Good identified the man as Juan Manuel Chavez.

In mid-August 1992, Martinez viewed a live lineup and immediately identified Chavez as her assailant. Chavez was then charged with two counts of aggravated sexual assault.

During trial, the State and Chavez's attorney both pointed out the scar that Martinez saw on her assailant's face—and Martinez again confirmed seeing it during her assault. And when the prosecutor asked Martinez who assaulted her, she identified Chavez.

Deborah Lind, an HPD criminalist who had examined the tape lifts gathered by Officer Webb, testified about her examination:

> Q. At my request, did you examine some hairs for this particular case?
> A. Yes, I did.
> Q. And what lab number did you assign that, your analysis?
> A. The lab number that was assigned to this case is L 92-8576.
> Q. Now, let me show you what's been marked as State's Exhibit No. 32. Did you retrieve these tape lifts that were submitted to the [evidence] room by officer Webb at my request?
> A. Yes, I did.

Q. And let me show you what's been marked as State's Exhibit No. 33 and No. 34. Are those pulled head hairs from the defendant in this case, Juan Chavez?

A. Pulled head and pulled pubic.

Q. All right. Now, after you retrieved the contents of State's Exhibit No. 32, which are the tape lifts with the various fibers and hairs attached to it, what did you do with those tape lifts?

A. After this was received, I then removed the hairs from the tape lifts and I compared these hairs with the known hairs of Mr. Chavez and to the known hairs of the complainant.

Q. Okay. Now, when you say you removed the hairs from the tape lifts, what is the first thing you did with those hairs that you removed from the tape lift?

A. Well, after I removed them from the tape lift, I examined them and I looked at them under a stereo microscope, which, in essence, magnifies them.

Q. Did you mount them on any particular slide or anything like that?

A. Yes. The next process after examining them, you would mount them on slides. They're a larger type slide than the normal type microscope slide, more of a rectangular shape. We call them hair slides and they're mounted and then I can look at them under a comparison scope.

Q. Did you mount the known hairs from the defendant as well?

A. Yes, I did.

Q. Is that both the head hairs and the pubic hairs?

A. Yes, I did.

Q. Is there a visible difference that you can tell between head hairs and pubic hairs?

A. Usually, yes, there is.

Q. Okay. In this particular case, could you distinguish between the head hairs and the pubic hairs?

A. Yes, I could.

Q. Now, you said that you compared them. Or you compared the hairs that you took from the tape lifts and the defendant's hairs. What exactly were you looking for when you compare them?

A. All right. I examined Mr. Chavez's head and pubic hair and I examined, of course, the hairs from the evidential tape. What you look at are characteristics that are similar, both that are found in the hairs from the defendant and in the hairs that were found on the tape lifts. At the same time, though, I am also, during this process, I must compare the hairs to the complainant's hairs in order to do a complete comparative analysis.

Q. Okay. Were you able to eliminate some hairs that were found on the tape lift as being Mr. Chavez's?

A. There were hairs on the tape lifts that were not Mr. Chavez's; this is true.

Q. You can tell that for sure by your examination?

A. Yes.

Q. Now, did you find any hairs that were consistent, any hairs on the tape lift that were consistent with the known hair from Mr. Chavez?

A. Yes, I did.

Q. And can you explain your findings?

A. Yes. I found one head hair on the tape lifts that was consistent with the known head hair sample of Juan Chavez.

Q. And can you explain what you mean – – what is it that you looked at that made you reach your conclusion?

A. Well, when you examine hairs, it's a slow, tedious, long process because you have to look at, from the root, to the tip of all the hairs. You examine the spectrum of the hairs received from the defendant and from the complainant. So, you have to study their hair separately. Then you must study the hairs found on the evidence, such as the tape lift. Then when I find two hairs that, first off, they have to be from the same type of body area, which is the head, in this case. I look, are they from the same race or similar racial characteristics, which they were. Then I look at color, the length, what the tip looked like and I looked at the various anatomical features of the hairs and compare these features and come to some conclusion.

Q. What anatomical features were you looking at in this particular case?

A. Well, all hairs have the same type of anatomical features in the sense that there are three parts of a hair.

Q. What are those?

A. The three parts of a hair, there is the cortex, which is the outer layer of the hair. The inner layer, next to that, is called – – excuse me. Is the cuticle is the outer layer. The inner layer of that is the cortex where the pigment is found. The inner area of that is the medulla, which is more like an air type sack running the course of the hair. You could think of a hair in two different ways. Either you could think of a pencil where the yellow covering on the outside of the pencil is the cuticle and the wooden porous part is the pigment and the black graphite running through the core of it is the medulla. Or under the microscope, it looks really more like a road where the cuticle is the shoulder of the road and the pavement, the black pavement is the cortex with the pigment and the wave – – the pavement markers that divide the road into lanes is your medulla.

Q. Now, when you compared the hair that you found on the trace – – I mean, on the tape lift to Mr. Chavez's hair, the hair that you said was consistent, what exactly was consistent? What were the same in the two hairs that you looked at?

A. Well, there was many things that were consistent. The length was in the same area as his. The coloring of the unknown hair and Mr. Chavez's hair were very, very close. The color pattern, the way the pigment was distributed down the root to the shaft, to the tip of the hair was very similar. The diameter of the hair was very similar. The amount of cuticle, the size of the cuticle, the color of the cuticle was very similar. I looked at type of coloring distribution, sometimes in some of peoples' hairs there's like a patchy type coloring distribution and this was similar in Mr. Chavez's hair.

Q. Is that the pigment that you're talking about?

A. Yes, yes, it is.

Q. Okay. What about the hair color variation, the shading of the hair color? Was that similar as well?

A. Yes. The coloring was very important and similar to Mr. Chavez's.

Q. Okay. And the density of the pigment? Did you compare that?

A. Yes. These are all naturally examined under the comparison scope and we're looking at the hairs side by side and moving the stages so that you're looking at both hairs at the same time, the unknown hair on one stage and the known hairs on the other. And so, therefore, you can study the hairs together as you're examining the color, as I've said, and the cuticle, the cortex and the medulla.

Q. Now, did you observe a root on the hair that was given to you on the tape lift?

A. Yes. When I do analysis, I only really study those hairs that have roots. So, those are the ones that I mainly mentioned in my report.

Q. Was there sufficient amount of root to perform a DNA analysis?

A. No, there was not.

Q. What is your conclusion as to the hair that was found on the tape lift and – – in comparison to the hair, known sample of hair from Mr. Chavez?

A. The unknown hair was consistent with the known head hair sample of Juan Chavez.

On cross-examination, the following exchange between Chavez's attorney and Lind took

place:

A. Are you saying can I identify that this is Mr. Chavez's hair that's on the tape lift? Is that what you're asking me, sir?

Q. Yes, ma'am.

A. No, I cannot identify it as Mr. Chavez's hair.

Q. In fact, it would be quite possible that folks of the same race would share characteristics on their head samples – – hair samples?
A. Yes, sir.

During summation the prosecutor emphasized Lind's testimony by saying the hair found in Martinez's apartment "matched or was consistent with" Chavez's hair. The prosecutor also emphasized Martinez's testimony that her assailant had "curly hair" when she said, "You can change the cut of your hair. You can make your hair straight. But you can't change the inside of your hair."

Chavez presented an alibi. According to his testimony, during the entire assault, he was either at his or a friend's apartment, school, a restaurant, or playing volleyball in Pasadena. He accounted for more than all of the relevant time periods, from 2:00 a.m. to nearly 10:00 p.m., on the day Martinez was assaulted. And he had five witnesses testify in support of his alibi. He also made statements concerning his alibi to Sergeant Angeli during the live lineup and to Teresa Farfan, a news reporter who interviewed him shortly before his trial. During cross-examination, when the prosecutor asked about the bluish tattoo on his wrist, Chavez denied ever having one. However, he did have a scar where Martinez saw the tattoo, and the record reflects that this scar was shown to the jury.

Rejecting Martinez's alibi-defense, the jury found Chavez guilty of two counts of aggravated sexual assault and sentenced him to thirty-five years' imprisonment for each

count.  In an unpublished opinion, the First Court of Appeals affirmed Chavez's conviction.[1]

## Applicant's Post-Conviction Motions for DNA Testing

In February 2006, Chavez filed a motion for forensic DNA testing of the unknown hair that Lind testified about at Chavez's trial.  The trial judge denied the motion, and the First Court of Appeals affirmed the denial.[2]  In December 2007, Chavez filed a second motion for forensic DNA testing.  This time the State agreed that Chavez was entitled to testing.  The hair was subjected to DNA testing, and the results excluded Chavez as its source.

## Habeas Proceedings

After receiving the DNA test results, in 2009, Chavez filed an application for a writ of habeas corpus.  He alleged, among other things, that he is entitled to a new trial because the State presented false testimony when Lind testified that the unknown hair found at Martinez's apartment matched his known hair.  The habeas judge held a hearing and adopted Chavez's proposed findings of fact and conclusions of law, which state, in relevant part:

- On May 12, 1992, Martinez was followed home from a grocery store by a man wearing sunglasses.

- When Martinez returned, the man, still wearing sunglasses, emerged from the closet and sexually assaulted her orally and anally.

---

[1] *Chavez v. State*, No. 01-93-00350-CR, 1994 Tex. App. LEXIS 225 (Tex. App.—Houston [1st Dist.] 1994).

[2] *Chavez v. State*, No. 01-06-00357-CR, 2007 Tex. App. LEXIS 9947 (Tex. App.—Houston [1st Dist.] 2007).

- Police officers collected hairs from the area of the floor in Martinez's apartment where the assault happened.

- Martinez was taken to a hospital for a sexual-assault examination in which oral and anal swabs, and loose head and pubic hair, were collected from her body.

- Martinez told the hospital staff that, prior to her assault, the last time she had sexual relations was in December 1991.

- Martinez saw Chavez, whom she believed to be her assailant, in a grocery store on July 19, 1992, and a police officer working in the store arrested Chavez.

- HPD criminalist Deborah Lind testified that she microscopically examined the hairs found at Martinez's apartment, that one of the hairs was very similar to Chavez's in diameter, color, color pattern, and pigment, and that the length of that hair was the same as Chavez's hair.

- Chavez testified at trial and presented an alibi defense.

- The State argued during summation that the hair found in Martinez's apartment matched Chavez's hair.

- During summation, the State argued that Chavez, in preparation for trial, could change the length and cut of his hair, but not its contents.

- Mitochondrial DNA (mtDNA) testing was not available at trial.

- The State ultimately agreed to mtDNA testing of the hair in question.

- The results of the mtDNA testing excluded Chavez as the source of the hair.

- Due to the newly available DNA evidence excluding Chavez as the source of the hair, he is entitled to a new trial.

- Chavez was convicted and sentenced to thirty-five years' in prison based on the State's argument that he was the source of the hair.

• But for Lind's testimony supporting the State's argument, and the State's summation, there is a reasonable probability that the jury would have acquitted Chavez.

Based on these findings, the habeas judge recommends granting relief.

Chavez contends that Lind's testimony is false. He argues that this use of false testimony elicited from Lind, and emphasized during the State's summation, entitles him to relief. We filed and set this case to determine whether the State presented false testimony and, if so, whether Chavez is entitled to relief based on our opinion in *Ex parte Chabot*, in which we held that due process is violated when the State unknowingly presents perjured testimony at trial.[3]

**Analysis**

A trial judge has a unique opportunity to observe witness demeanor first-hand and therefore has the best vantage point to assess witness credibility.[4] Accordingly, we ordinarily accept a trial judge's findings of fact and conclusions of law.[5] But

> [w]hen our independent review of the record reveals findings and conclusions that are unsupported by the record, we will, understandably, become skeptical as to the reliability of the findings and conclusions as a whole. In such cases, we will proceed cautiously with a view toward exercising our own judgment. And when we deem it necessary, we will enter alternative or contrary findings and conclusions that the record supports. Furthermore, when we determine that the trial judge's findings and conclusions that are supported by the record require clarification or supplementation, we may exercise our judgment and

---

[3] 300 S.W.3d 768, 772 (Tex. Crim. App. 2009).

[4] *Ex parte Van Alstyne*, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007).

[5] *Id.*

make findings and conclusions that the record supports and that are necessary to our independent review and ultimate disposition.[6]

In *Chabot*, we held that the State's unknowing use of perjured testimony "is a trial error that is subject to a harmless error analysis," and "'the applicant has the burden to prove by a preponderance of the evidence that the error contributed to his conviction or punishment.'"[7]  "Testimony that is untrue" is one of many ways jurists define false testimony.[8]  The Supreme Court has indicated that "improper suggestions, insinuations and, especially, assertions of personal knowledge" constitute false testimony.[9]  Recently, at the beginning of this term, we looked at the various definitions of perjury:[10]  The First Circuit described perjury as "the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."[11]  And the Fifth Circuit found that witness response to questioning plays a large role in determining whether perjury has been committed when it stated that "[t]he Agents did not candidly respond to the defense counsel's questions, and

---

[6] *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (citing *Ex parte Young*, 418 S.W.2d 824, 829 (Tex. Crim. App. 1967); *Ex parte Adams*, 768 S.W.2d 281, 288 (Tex. Crim. App. 1989); *Ex parte Van Alstyne*, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007) (per curiam)).

[7] *Ex parte Chabot*, 300 S.W.3d 768, 771 (quoting *Ex parte Fierro*, 934 S.W.2d 370, 374 (Tex. Crim. App. 1996)).

[8] BLACK'S LAW DICTIONARY 1485–86 (7th ed. 1999).

[9] *See Berger v. United States*, 295 U.S. 78, 88 (1935).

[10] *Napper*, 2010 Tex. Crim. App. LEXIS 1209, at *111.

[11] *United States v. Tavares*, 93 F.3d 10, 14 (1st Cir. 1996).

the prosecuting attorney did nothing to correct the Agents' evasive testimonies."[12]

Regardless of how we define perjury or false testimony in the context of a due process violation, we disagree with the trial judge's recommendation to grant relief. Lind's testimony that the hair from the tape lift shared similar physical characteristics with Chavez's known hair has not been proven to be false.[13] Lind clearly stated that she could not positively identify the unknown hair as Chavez's. After examining the hairs from the tape lift under both stereo and comparison microscopes, Lind testified that the physical characteristics of those hairs were consistent with the physical characteristics of Chavez's hair. She stated that the length, coloring pattern, pigment distribution, and cuticles of the hair from the tape lift and Chavez's known hair sample were similar. Lind's testimony is not false just because post-conviction DNA testing later proved that the hair did not come from Chavez.[14] The similarities between the physical characteristics of the unknown hair and Chavez's hair identified by Lind at Chavez's trial have not been refuted.

Finally, even if we assumed that Chavez has shown a due process violation, we would find no harm.[15] First, the DNA test results do not exonerate Chavez. That the hair is not

---

[12] *United States v. Carter*, 566 F.2d 1265, 1270 (5th Cir. 1978).

[13] *See Napper*, 2010 Tex. Crim. App. LEXIS 1209, at *111–12 (holding that even though the HPD criminalist gave inaccurate testimony regarding his statistical frequency estimate, which was based on his DNA analysis, he did not commit perjury).

[14] *See id.*

[15] *Ex parte Chabot*, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009).

Chavez's does not conclusively establish that he did not commit the sexual assault.

In *Jacobs v. State*, Jacobs was convicted of aggravated sexual assault.[16] Jacobs filed a post-conviction motion for DNA testing of two hairs from the scene of the offense.[17] In the Texarkana Court of Appeals, Jacobs argued that DNA testing could implicate a third party and thereby exonerate him.[18] In affirming the trial judge's denial of DNA testing, the court of appeals reasoned that even if DNA testing proved that the hairs came from a third party, it would show only "that a third party had, at some point in time (but not necessarily at the time of the crime), been inside the sleeper compartment of the tractor truck."[19] The court went on to note that had the sexual assault examination yielded blood or seminal fluid from the rapist, its conclusion might have been different, but the presence of a third party's hair on Jacob's bed linens or clothing that does not belong to the victim does not conclusively prove Jacob's innocence.[20]

Similar reasoning can be applied to this case. Because the hair at issue came from Martinez's living room—a common area open to visitors—as opposed to her body, the fact that it is not Chavez's shows only that a third party may have been, at some time, though not

---

[16] 115 S.W.3d 108, 110 (Tex. App.—Texarkana 2003).

[17] *Id.* at 110–11.

[18] *Id.* at 113.

[19] *Id.*

[20] *Id.* at 113–14.

necessarily at the time of the assault, in her apartment before the tape lifts were taken. Further, the DNA test results could not exclude either of Martinez's brothers as contributors of the hair. That either of Martinez's brothers, or another unidentified party, were in her apartment does not exonerate Chavez.

Martinez's consistent and repeated identifications militate against a finding of harm.[21] She first spotted him by happenstance approximately a month after her assault while riding a city bus. When Martinez and Ibarra boarded the bus, Chavez was already there. During the two and a half to three mile drive, Martinez noticed the man who had attacked her. She told Ibarra that her assailant was on the bus. Ibarra testified that Martinez "was very afraid," and that "she wanted . . . to get home fast." Ibarra also testified that Martinez told her not to look at Chavez because "she was afraid that he saw us," and that Martinez was "shaking." Further, both women testified that Chavez was hiding himself behind other passengers on the

---

[21] *See Motilla v. State*, 78 S.W.3d 352, 358–59 (Tex. Crim. App. 2002) (holding that the improper admission of evidence at a murder trial was harmless in light of substantial evidence of guilt); *Prior v. State*, 647 S.W.2d 956, 959–60 (Tex. Crim. App. 1983) (finding that "the erroneous admission of the extraneous offenses did not contribute to the finding of guilty or to the punishment assessed" because "the evidence of guilt was overwhelming, even without the extraneous offenses."); *Little v. State*, 567 S.W.2d 502, 505 (Tex. Crim. App. 1978) (holding that the State's improper argument was harmless error due to the existence of overwhelming evidence of guilt); *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (holding that overwhelming evidence of guilt precluded appellant from establishing the prejudice necessary to prevail on his ineffective assistance of counsel claim); *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) (where a habeas petitioner claimed that his trial counsel was ineffective for denying him his right to testify at trial, the court found that "[c]onsidering the overwhelming evidence of Sayre's guilt, we cannot conceive of anything Sayre could have said that would have provided *any* reasonable possibility of a different outcome.").

bus. And Ibarra testified that "he got off the bus real fast . . . almost running through the stairs."

Martinez saw Chavez a second time at the Fiesta Mart where Chavez was arrested and taken into custody. While Martinez was shopping with Ibarra, Chavez walked by her and turned to look at her twice. Martinez and Ibarra each summoned a security guard. The guard that Martinez summoned testified that the man pointed out to him as Martinez's assailant "appeared nervous" and was acting as if he wanted to leave Fiesta "immediately." Officer Goode, the security guard that Ibarra summoned, testified that as Martinez watched Chavez being arrested and taken into custody, she was "crying," "pretty hysterical," and "shaking quite a bit." She even "went into a trance-like condition," "was very pale and limp," and "looked like she was motioning her mouth," but "couldn't get her mouth open." Officer Goode eventually called paramedics to take care of Martinez.

Notably, Chavez's behavior—when encountered by Martinez fortuitously on two occasions—evidences his recognition of Martinez in association to the offense.[22] Each time Chavez was spotted by Martinez, he exhibited signs of being nervous and attempted to evade Martinez.

---

[22] *Colella v. State*, 915 S.W.2d 834, 839 n.7 (Tex. Crim. App. 1995) ("[w]e have repeatedly held that flight is evidence of a circumstance from which an inference of guilt may be drawn." (quoting *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989))); *see also Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997); *Valdez v. State*, 623 S.W.2d 317 (Tex. Crim. App. 1981); *Holloway v. State*, 525 S.W.2d 165 (Tex. Crim. App. 1975).

Martinez also gave an accurate description of Chavez to the sketch artist. Martinez's description included a thin scar on Chavez's right cheek, which was noted before the jury by the prosecutor and defense counsel at Chavez's trial. The jury was also shown a scar on Chavez's right wrist, exactly where Martinez described having seen the bluish tattoo. At trial, when the prosecutor asked Martinez who assaulted her, she identified Chavez.

Last, while Chavez did present an alibi, the jury did not find it credible. Chavez testified that on the day of the assault he was at school, a restaurant, a friend's apartment, and playing volleyball in Pasadena. Minutes before the live lineup from which Martinez identified Chavez as her assailant, Chavez told Sergeant Angeli that he was at school on the day of the assault. But when Sergeant Angeli asked Chavez which campus, Chavez had no answer. Sergeant Angeli testified that "the conversation from there on went kind of downhill. It was evasive . . . ." Chavez testified that, on the day of the assault, after leaving school, he ended up in Pasadena playing volleyball. But when speaking with Sergeant Angeli, he failed to mention anything about playing volleyball. Years after the incident, as the time for trial approached, Chavez was interviewed by Teresa Farfan, a news reporter. She testified that when she questioned Chavez about his whereabouts on the day of the assault, he told her that "he and another friend went out of his apartment to have something to eat and then leave to Pasadena." Farfan continued, "He mentioned something about Houston Community College but I don't recall if it was that time." Chavez hardly mentioned being at school on the day of the assault, something which he and one of his alibi witnesses

stressed while testifying. Chavez told three versions about his whereabouts on the day of the offense. Additionally, although Chavez presented five witnesses to corroborate his alibi, the jury, as indicated by its verdict, did not believe them. Indeed, the trial judge, in his findings of fact, did not suggest that the alibi defense was credible; instead, he merely found the obvious: "Chavez testified at trial and presented an alibi defense." Based upon the record before us, as well as the trial judge's factual finding that failed to find the alibi defense credible, we conclude that Chavez's alibi evidence is not believable.

Based on the foregoing, even if we assumed that Chavez has shown a due process violation, we conclude he cannot show harm.

## Conclusion

Contrary to the trial judge's findings and conclusions, we hold that Martinez has not shown a due process violation; therefore, we deny relief.


DATE DELIVERED: November 17, 2010
DO NOT PUBLISH