IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,264






EX PARTE JESSE BENAVIDES, Applicant









ON APPLICATION FOR A WRIT OF HABEAS CORPUS

CAUSE NO. 2001CR0493-W1 IN THE 187TH JUDICIAL DISTRICT COURT

FROM BEXAR COUNTY





 Keasler, J., announced the judgment of the Court and filed an opinion in which
Johnson and Cochran, JJ., joined. Meyers, J., filed a concurring and dissenting
opinion in which Hervey, J., joined. Holcomb, J., filed a dissenting opinion. Keller,
P.J., Price, and Womack, JJ., dissented.



O P I N I O N


 Jesse Benavides seeks habeas corpus relief, alleging that he is actually innocent of
aggravated sexual assault based on the recantation of the victim, Irma Pennington. Contrary
to the trial judge's findings, we find that Pennington's recantation is not credible. We also
hold that the trial judge applied an improper, less-stringent standard of review when
recommending to grant relief. We therefore deny habeas relief. 

Background

 In July of 1999, Pennington told Bexar County Sheriff's Office Detective Lorenz that
Benavides sexually assaulted her in May of 1999. Pennington said that she went to pick up
her van from the Performance Body Shop, but because she did not have the insurance money
to pay for the repairs in hand, a woman at the shop would not release the van to her. The
woman at the shop offered to have Benavides, a porter at the shop, drive Pennington home
in her van to see if the insurance check arrived in the mail. Pennington recalled that
Benavides was wearing a blue shirt with the name Jesse on it. 

 Benavides drove Pennington the thirty miles to her house. When they arrived, he
asked to use her phone, and Pennington allowed Benavides to come inside her house. 
Because Pennington had been disabled by a roll-over car accident in 1995, she had trouble
walking and sat down on the couch next to Benavides while he used the phone. Benavides
then held Pennington's arm as they looked around her house. The two returned to the couch,
and Benavides started touching Pennington's chest and put his hand down her pants. She
"didn't fight." Explaining this, Pennington told Detective Lorenz:

 I am a disabled ARMY [sic] nurse[,] and I remember always telling my
patients and their family that women should not resist rape and the injuries
would be minimal. It was very difficult to not do anything[,] but I didn't resist. 


 The thing I didn't want to make him mad and the thing I said nicely was I
don't feel very comfortable with the things that he was doing. He asked where
the bed was[,] and he held my hand and took me to the bed that is next to the
living room. He took my clothes off, he only unzipped his pants and brought
them down a bit to about his knees and introduced his penis into my vagina
and did not stay in very long. I do not know[] if he finished because I don't
have sensation on my right side[,] even on the inside. 


Benavides left and took Pennington's van back to the shop. 

 In July, Pennington returned to the shop and told the manager about the incident. The
manager told Pennington that he could not do anything and advised her to call the police. 

 In March of 2000, Pennington identified Benavides in a photo line-up as the
individual who sexually assaulted her. At this time, Pennington clarified her understanding
of Benavides's name: "After thinking about it[,] and how I came up with the name of Jesse
FLACA [sic]. I remembered seeing the last name of FLACA [sic] on the shirt and him
telling me that his first name was Jesse." Finally, Pennington stated that she wanted to "file
charges" on Benavides "for what he did to" her.

 Benavides was charged with sexual assault in January 2001. 

 On July 20, 2001, Pennington wrote a letter to the trial judge asking the judge to
consider placing Benavides on probation.

 In September of 2001, the Department of Criminal Justice Community Justice
Assistance Division prepared a presentence investigation (PSI) report for the trial judge. The
supervision officer who prepared the report called Pennington, and Pennington said that she
wanted Benavides to get probation and then hung up. Regarding the sexual assault
allegation, Benavides told the supervision officer: 

 I took her home. She was a nice lady. She was playing around with me
making me laugh. We sat on the couch and whatever happened, happened. I
didn't do intercourse with her. I might have played around with her, but that's
it. It happened, it did happen. I'm sorry it happened. I regret it[,] and it will
never happen again.


 In October of 2001, Benavides entered a plea of no contest to the charge. Pursuant
to a plea agreement, the trial judge deferred adjudicated and placed Benavides on community
supervision for seven years. The State filed a motion to adjudicate Benavides's guilt in
November of 2006, alleging that Benavides violated two terms and conditions of his
community supervision. In February of 2006, Benavides pled true to the State's allegations,
and the trial judge adjudicated his guilt and sentenced him to twenty years' imprisonment. 

 After Benavides was sentenced, in January of 2008, Pennington executed an affidavit
stating that she was in the trial court when Benavides was adjudicated guilty and that she
"DID NOT RECOGNIZE HIM AS THE PERSON THAT SEXUALLY ASSAULTED
[HER] . . . ." Pennington hand-delivered the affidavit to Benavides's attorney. 

Habeas Proceedings

 In April of 2009, based on Pennington's affidavit, Benavides filed an application for
a writ of habeas corpus claiming that he is actually innocent. The trial judge held a live
evidentiary hearing in September of 2009.

 On direct examination by Benavides's attorney during the habeas hearing, Pennington
testified that she had been the victim of a sexual assault. At the revocation hearing,
Pennington approached Benavides's attorney and told him that she did not recognize
Benavides as the man who assaulted her. She maintained that the face of the man who
assaulted her is embedded in her mind and that she is certain that Benavides is not her
assailant. 

 On cross-examination by the State, Pennington registered some ambivalence about
the statement she had given to the Sheriff's Department in 2000 in which she accused
Benavides of sexual assault. She testified that she had been pressured because the detective
had been "loud," that some of the initials or signatures on the statement were not hers, and
that she did not recall some of things in the statement about the assault. She also noted that
her address was incorrect and could not believe that she had signed the statement. 

 Pennington then recalled the facts about the assault. She admitted that she had been
assaulted by someone who worked for the body shop. With the mention of the body shop,
Benavides's attorney invoked the rule regarding anyone in the courtroom who had worked
at the shop and would be called to testify. Sandy Kowalick, the woman who directed
Benavides to drive Pennington home on May 11, 1999, was ordered to leave the courtroom,
after which Pennington continued to testify.

 Pennington stated that her assailant wore a blue uniform shirt with the name Flaca on
it. The prosecutor also asked Pennington if the man who came inside her home to use the
phone sexually assaulted her. In response, Pennington retracted her earlier allegation:

 A. You know, sexually assaulted, that's kind of - - the severity, it's very - - 

 Q. I can put it another way.

 A. It's a word that doesn't fit, because I was not assaulted - - 

 Q. Okay. Let me ask you this - - 

 A. It was consensual, I guess you can say.

 Q. Well, let me ask you this: Did the person who drove you home have sex
with you on that day?

 A. Yes.

 Q. And did you invite that person, who drove you home that day, to have sex
with you on that day? Did you say to him, "I want to have sex with you?"

 (Witness Laughs)

 A. I don't remember. 

 Pennington then stated that she did not recall ever saying that she did not consent.
When asked whether she had told prosecutor Kirsta Melton that she had said, "No," to
Benavides, Pennington said that she had not, only that she told him that she was
uncomfortable. Pennington asserted that sex had not been something that she wanted that
day but that she had allowed it. Pennington stated that when dealing with sexual assault
victims as an army nurse, she learned "never say no" because "more injuries occur." She
stated that this was the reason she did not want to say "no" to Benavides or resist, possibly,
but she did not specifically remember. 

 Pennington continued to waver on the issue of consent when questioned by the State:

 Q. Okay. So there's really no question, though, at this time that, again,
somebody had sex with you on that day, May 11, 1999, and it was not with
your consent?

 . . .

 A. No.

 A. It was - - those words are not proper, because I wouldn't say that it was
not with my consent. It was with my consent.

 Q. But you did not want - - you did not want to be involved in that at the
time; is that correct?

 A. I don't think so. 


 Pennington also wavered about her position on punishing Benavides:


 Q. There seems to be a sense coming through from [your prior statements]
that you did not want the person who sexually assaulted you on that day - -
May 11, 1999, to be punished. Is that accurate?

 A. No. 

 Q. Okay. So, you are telling me today then that you did not want the person
who sexually assaulted you to be punished?

 A. No, I'm not saying everything. 

. . . 

 Q. On another day, about a month later or two, did you go back to the body
shop? Do you recall going back to the body shop to tell the manager
something?

 A. Yes. 

 Q. Okay. Can you tell us what it was that you went back to the body shop to
tell the manager?

 A. I was just mentioning that I was sexually injured - - that I had sex with the
person who came out to the house.

 Q. Okay. Now, did you - - why did you feel the desire to go and tell the
manager about the incident?

 A. So the man will be fired.

. . . 

 A. And to have common sense to fire the man.

 Q. Okay. Why do you think that common sense should lead to the conclusion
that that man should be fired?

 A. Because it was not somebody that trust - - that they should place trust in
him. 


 The State called Kowalik to rebut Pennington's identification testimony. Kowalik
stated that her manager directed her to have a porter drive Pennington home to get the
insurance check for the repairs, which had been mailed directly to Pennington. Kowalik
asked Benavides, who she knew by the nickname Flaca, to drive Pennington home. Kowalik
described Benavides as a basic porter; he would clean cars and the shop and run errands. 
Kowalik said that Benavides was gone for an abnormal amount of time when he drove
Pennington home. She tried to contact him on the radio but could not reach him. 

 The State also called Assistant Criminal District Attorney Kirsta Melton to testify
about her investigation and prosecution of the case. After reviewing the notes from her
interview with Pennington, Melton testified that Pennington had told her that she told
Benavides "no" three times in response to his sexual advances. Pennington never told her
that the encounter was consensual. Pennington had also been certain about her identification
of Benavides, and Pennington never gave any indication that she was pressured to pick
someone in the lineup. 

 At the end of the hearing, the trial judge indicated that he had some difficulty grasping
the standard of review for bare actual innocence claims, but he nevertheless concluded that
Benavides was entitled to relief. Consequently, he later entered findings of fact and
conclusions of law recommending that Benavides's conviction be set aside. 

 Summarizing his impression of the testimony at the hearing the trial judge found,
among other things:

  "that [Pennington] said several different things."


  "[the sum of Pennington's] testimony [was] that - - it wasn't him, and
even if it was him, it was consensual."


  "that the evidence presented by the State through the testimony of the
State's witnesses was impeachment evidence, impeaching the
credibility of the complainant, not direct evidence of Applicant's guilt."


  "that there was direct evidence that the Applicant was in fact the person
who drove Irma Pennington home from the body shop on May 11,
1999. Yet, there was no direct evidence presented at the writ hearing
that the Applicant did in fact sexually assault Irma Pennington."


  "that there has never been any evidence presented at any stage of this
case that Applicant intentionally or knowingly compelled said
complainant to submit or participate by the use of physical force or
violence."


 The trial judge listed the evidence supporting Benavides's guilt as follows:


  Pennington's statement to the Sheriff's Department.

 

  that Pennington identified Benavides in a line-up.


  that Benavides admitted something "happened" with Pennington in the
PSI. 


 The judge also listed the newly-discovered evidence supporting Benavides's
innocence claim: 

  Pennington's January 2008 affidavit stating that she did not recognize
Benavides as her assailant.


  Pennington's testimony that she is "certain" Benavides was not the man that
sexually assaulted her.


  that Pennington signed her initial, 2000 statement to the Sheriff's
Department "under pressure."

 

  that Pennington did not recognize anyone in the line-up at first but
identified Benavides after the detective urged her to "choose one." 

 

  that the encounter was consensual, even though Pennington was
uncomfortable with it.


 The trial judge then found that the newly discovered evidence that Pennington
"consented and 'allowed' Applicant to engage in sexual activity with her even though it made
her uncomfortable is more believable than the evidence supporting Applicant's guilt listed
above." (1) This, according to the judge, is consistent with Pennington's decision to wait two
months to report the assault, Benavides's version of the events, and that the parties reached
a plea-bargain agreement for deferred adjudication. The trial judge opined that he was
"bothered greatly" by Benavides's failure to testify at the hearing and determined that the
only thing to persuade him about Benavides's innocence was Pennington's testimony. The
judge questioned Pennington's credibility about her inability to recognize Benavides as her
assailant because of Kowalik's testimony that Benavides was the one to drive Pennington
home. The judge found that Pennington "does not believe" (2) that Benavides sexually
assaulted her and that her statement that she was pressured by the detective in making her
2000 statement to be credible. 

 The trial judge, in his conclusions of law, determined that he "has difficulty saying
that the newly discovered evidence supporting guilt, unquestionably establishes Applicant's
innocence." The judge then stated, 

 However, there is arguably another standard set forth in Ex parte Brown[ (3)]
that does not seem to carry the steep burden. In Ex parte Brown, the Court
stated that 'to succeed in an actual innocence claim, the applicant must show
by clear and convincing evidence that, despite the evidence of guilt that
supports the conviction, no reasonable juror could have found the
applicant guilty in light of the new evidence.


 When faced with that standard, this Court concludes that the newly
discovered evidence does clearly and convincingly show, despite the
evidence of guilt that supports the conviction that no reasonable juror
would have found applicant guilty in light of the new evidence. (4) 

Law

 The Due Process Clause to the United States Constitution bars the incarceration of an
innocent person. (5) A bare claim of actual innocence, based on newly discovered evidence,
is cognizable on habeas, regardless of whether the applicant's conviction was the result of
jury trial, guilty plea, or plea of nolo contendere. (6) To establish a bare innocence claim, an
applicant must prove "by clear and convincing evidence that no reasonable juror would have
convicted him in light of the new evidence." (7) An applicant must overcome the presumption
that the conviction was obtained without error. (8) 

 When confronted with a bare actual-innocence claim, courts must "assess the probable
impact of the newly available evidence upon the persuasiveness of the State's case as a whole
. . . by weigh[ing] such exculpatory evidence against the evidence of guilt . . . ." (9) Thus,
taking into account the credibility of witnesses, courts must weigh the newly available
evidence against the old inculpatory evidence to determine if the new evidence
unquestionably establishes the applicant's innocence. (10) 

 As the original factfinder in habeas proceedings, we are not bound by a trial judge's
findings, but in most circumstances, we will defer to a judge's findings when they are
supported by the record. (11) But 

 [w]hen our independent review of the record reveals findings and conclusions
that are unsupported by the record, we will, understandably, become skeptical
as to the reliability of the findings and conclusions as a whole. In such cases,
we will proceed cautiously with a view toward exercising our own judgment.
And when we deem it necessary, we will enter alternative or contrary findings
and conclusions that the record supports. Furthermore, when we determine
that the trial judge's findings and conclusions that are supported by the record
require clarification or supplementation, we may exercise our judgment and
make findings and conclusions that the record supports and that are necessary
to our independent review and ultimate disposition. (12)

Analysis 

 In this case, we conclude that it is necessary to exercise our original factfinding
authority with respect to the credibility of Pennington's testimony at the habeas hearing. The
record does not support the trial judge's finding that Pennington's testimony about her sexual
encounter with Benavides or the circumstances under which she made her 2000 statement
to the Sheriff's Department are credible. Next, our review of the record from the hearing and
the trial judge's conclusions of law reveals that the trial judge was somewhat confounded by
our decision in Ex parte Brown. There is one standard for bare actual innocence habeas
claims, and the trial judge erred in concluding that Ex parte Brown announced a second, less-stringent standard that would entitle Benavides to relief under the facts of this case. 

 Turning to the trial judge's credibility finding about Pennington's testimony, we find
his credibility determination under these circumstances to be unwarranted. On the state of
the record, we are hard pressed to find her testimony credible. Initially, Benavides based his
actual innocence claim on Pennington's inability to recognize Benavides as her assailant at
the revocation hearing, approximately eight years after the assault occurred. At first,
Pennington testified that she had indeed been sexually assaulted, but that Benavides was not
the person who assaulted her. She also claimed that the detective pressured her to sign the
2000 accusing Benavides of sexually assaulting her and that she was told to pick someone
out of the photo line-up. Pennington's position changed drastically when she became aware
of Kowalik's presence in the courtroom. Inexplicably, after Benavides's attorney invoked
the rule and Kowalik left the courtroom, Pennington asserted, for the first time, that the
sexual encounter with Benavides was consensual, though her understanding of consensual
is more or less mistaken. Pennington laughed on two occasions when directly challenged by
the prosecutor on the issue of consent and then answered evasively by claiming that she
could not remember. Additionally, Pennington wavered on the issue of consent, stating that
she consented and also stating that she did not want to be involved in having sex with
Benavides. Significantly, Pennington became evasive and contradictory throughout her
testimony when she was questioned about her recollection of the assault, her interview with
the Sheriff's Department, and her role in the prosecution of the case. As a result, we cannot
conclude that her testimony on the issue of consent and the authenticity and accuracy of her
2000 signed statement to the Sheriff's Department is credible. Thus, although we are
presented with only a cold-record, we cannot agree with the trial judge's determination that
Pennington's testimony about Benavides is credible and believable. 

 Next, we turn to the trial judge's confusion with the standard applicable to bare actual-innocence claims. In Brown, we explained the requirements of the bare-actual-innocence
standard in two ways. First, citing our prior decisions in Ex parte Tuley and State ex. rel.
Holmes v. Third Court of Appeals, we said that "an applicant must show 'by clear and
convincing evidence, that despite the evidence of guilt that supports the conviction, no
reasonable juror would could have found the applicant guilty in light of the new evidence.'" (13)
And then, in the next sentence, we stated, "This showing must overcome the presumption
that the conviction is valid and it must unquestionably establish applicant's innocence." (14) 
These two statements explain the one standard for bare-actual-innocence claims; they do not
set out two, alternate and separate requirements. If an applicant does not unquestionably
establish innocence, then the applicant has failed to prove that no reasonable juror could have
found the applicant guilty in light of the new evidence, and vice-versa. 

 While a guilty plea or plea of nolo contendere does not prevent an applicant from
seeking habeas relief under our actual innocence jurisprudence, such a plea, along with the
with any evidence entered, or stipulation to the evidence, (15) supporting the plea, must be
considered in weighing the old evidence against the new evidence. (16) Benavides entered a
knowing and voluntary plea of nolo contendere to the charge of sexual assault. Even though
Benavides admitted only that he "played around" with Pennington and denied having sexual
intercourse with her to the supervision officer responsible for compiling the PSI, as part of
his plea, Benavides agreed that the facts alleged in the indictment charging sexual assault
were true and correct. Benavides also agreed to allow the State to introduce documentary
evidence supporting his guilt, which included Exhibit 1. Exhibit 1 contained the Sheriff
Department's report detailing Pennington's allegation and the Department's investigation
into the case. The narrative about the assault, as chronicled by the Sheriff's Department, is
consistent with Pennington's signed statement in 2000. The dissent's alleged problem with
the conflict between the charged offense and the evidence supporting it is without merit. (17)
The offense of sexual assault always involves submission and participation through
violence. (18) Consequently, the evidence presented in support of Benavides's actual innocence
claim does not overcome his knowing and voluntary plea and the resulting presumptively
valid conviction. (19)

 Here, we agree with the trial judge's first inclination that the evidence presented on
habeas does not unquestionably establish Benavides's innocence. Having been presented
with a recantation that is not credible, we conclude that Benavides has not sustained his
burden--the new evidence of innocence does not clearly and convincingly outweigh the old
evidence supporting his conviction. Therefore, contrary to the trial judge's conclusion,
Benavides has not shown by clear and convincing that no reasonable juror would have found
him guilty. 

Conclusion 

 We hold that Benavides has failed to show that he is actually innocent of sexual
assault by clear and convincing evidence. Therefore, we deny relief. 


DATE DELIVERED: May 26, 2010

DO NOT PUBLISH 

 
1. Emphasis in original.
2. Emphasis in original.
3. 205 S.W.3d 538 (Tex. Crim. App. 2006). 
4. Emphasis in original. 
5. Ex parte Elizondo, 947 S.W.2d 202, 204-05 (Tex. Crim. App. 1996). 
6. Ex parte Brown, 205 S.W.3d at 544-46 (citing Ex parte Tuley, 109 S.W.3d 388
393-96 (Tex. Crim. App. 2002)); see also Tex. Code Crim. Proc. art. 27.02 § 5 (a plea of
nolo contendere has the legal effect of a guilty plea).
7. Ex parte Elizondo, 947 S.W.2d at 209.
8. Ex parte Brown, 205 S.W.3d at 545.
9. Ex parte Elizondo, 947 S.W.2d at 206.
10. Ex parte Brown, 205 S.W.3d at 546.
11. Ex parte Reed, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (citing Ex parte
Young, 418 S.W.2d 824, 829 (Tex. Crim. App. 1967); Ex parte Adams, 768 S.W.2d 281,
288 (Tex. Crim. App. 1989); Ex parte Van Alstyne, 239 S.W.3d 815, 817 (Tex. Crim.
App. 2007) (per curiam)).
12. Id. at 727-28.
13. Ex parte Brown, 205 S.W.3d at 545 (citing Ex parte Tuley, 109 S.W.3d at 392;
State ex rel. Holmes v. Third Court of Appeals, 885 S.W.2d 389, 398 (Tex. Crim. App.
1994)). 
14. Id. (citing Ex parte Tuley, 109 S.W.3d at 392).
15. See Tex. Code Crim. Proc. Ann. art. 1.15. 
16. See Ex parte Tuley, 109 S.W.3d at 391 ("Convicting courts should also give
great weight respect to knowing, voluntary, and intelligent pleas of guilty."), 392 ("A
convicting court is not free to ignore a guilty plea when reviewing a collateral attack.");
see also Tex. Code Crim. Proc. art. 1.15.
17. Post at 11.
18. Wisdom v. State, 708 S.W.2d 840, 845 (Tex. Crim. App. 1986) (rape constitutes
a crime of violence per se). 
19. See Breazeale v. State, 683 S.W.2d 446, 450-51 (Tex. Crim. App. 1985) (op. on
reh'g) (The trial court's judgment is presumed to be truthful and should not be
disregarded) (citing Ex parte Morgan, 412 S.W.2d 657 (Tex. Crim. App. 1967)).