

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NO. AP-77,038

**US CARNELL PETETAN, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL**
**FROM CAUSE NO. 2012-2331-C1**
**IN THE 19TH DISTRICT COURT**
**MCLENNAN COUNTY**

**ALCALA, J., filed a dissenting opinion.**

**DISSENTING OPINION**

The question I address in this dissenting opinion is whether the evidence establishes

that US Carnell Petetan, Jr., appellant, is intellectually disabled so that he is categorically

barred from the death penalty for capital murder. The answer to that question likely turns on

the legal standard that is used to define what constitutes intellectual disability in this context,

and this is where I part from this Court's majority opinion. Today, this Court's majority

opinion answers that question by deciding that appellant is not intellectually disabled under

Texas's existing legal standard for assessing claims of intellectual disability as described in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). For two reasons, I respectfully disagree that it is appropriate to resolve appellant's case under *Briseno*. First, I would not decide this appeal at this juncture because, at best, the Texas standard is in flux with respect to whether this state is currently applying an improper standard for determining intellectual disability. I would defer resolution of this appeal until after the Supreme Court decides *Moore v. Texas*, in which the issue there, as here, is whether Texas's legal standard for determining intellectual disability violates the Eighth Amendment's prohibition against the execution of intellectually disabled people. *See Moore v. Texas*, No. 15-797 (pet. granted June 6, 2016, argued Nov. 29, 2016). I disagree with this Court's judgment affirming this death sentence through the application of a questionable standard to the facts of this case, and I would not enter any judgment on this appeal at this time. In the alternative, I would hold that *Briseno* is unconstitutional, and I would resolve appellant's complaint under a constitutionally compliant standard that is informed by the current medical diagnostic framework and that does not resort to consideration of unscientific factors. Given the limited amount of time that I have had to prepare this dissenting opinion, I confine my discussion in this case to the proper standard for deciding intellectual-disability claims in Texas rather than attempting to apply the law to the facts of this case. In light of these considerations, I respectfully dissent from this Court's judgment that affirms the conviction and sentence of death imposed against appellant through the application of an improper standard.

**I. At Best, Texas's Standard for Determining Intellectual Disability is in Flux**

In his tenth and eleventh points of error, appellant contends that his intellectual disability renders him categorically ineligible for the death penalty and that the jury's determination to the contrary at the punishment phase of his trial was against the great weight and preponderance of the evidence. In the course of presenting those complaints, he also asks this Court to reevaluate its substantive standard for addressing claims of intellectual disability in light of recent guidance on that matter from the Supreme Court in *Hall v. Florida*, 134 S. Ct. 1986 (2014). In rejecting appellant's complaints, this Court's majority opinion applies this Court's established standard for evaluating claims of intellectual disability as set forth in *Briseno,* 135 S.W.3d at 7-8. This Court explains that, to establish intellectual disability under the *Briseno* standard, appellant must show by a preponderance of the evidence (1) significantly subaverage general intellectual functioning, generally shown by an intelligence quotient (IQ) of 70 or less; (2) accompanied by related and significant limitations in adaptive functioning; and (3) the onset of the above two characteristics having occurred before the age of eighteen. *Id.* at 7. Applying the *Briseno* framework to appellant's case, this Court's majority opinion concludes that the evidence is legally and factually sufficient to support the jury's negative answer to the issue on intellectual disability, and it further declines appellant's invitation to reconsider the *Briseno* standard in light of *Hall* which, appellant contends, has called the validity of portions of that standard into question.

Although this Court's analysis suggests that the *Briseno* standard is fully compliant

with Supreme Court precedent defining the scope of the prohibition on the execution of intellectually disabled people, I disagree that, at this juncture, it is appropriate to continue to apply that standard as a basis for rejecting appellant's intellectual disability claim. As I will explain further below, the Supreme Court's decisions in *Atkins v. Virginia* and *Hall* signal that any assessment of intellectual disability must be informed by, and cannot be untethered from, the current medical diagnostic framework for assessing intellectual disability, but this Court's standard in *Briseno* has strayed from that requirement. *See Atkins v. Virginia*, 536 U.S. 304, 307 (2002); *Hall*, 134 S. Ct. at 1999. In particular, although *Briseno* properly held that claims of intellectual disability must be assessed in light of the three prongs described above that comprise the clinical/medical framework for evaluating intellectual disability, *Briseno* also incorporated additional non-medical "evidentiary factors" that could serve as a basis for rejecting a defendant's intellectual-disability claim, even if he satisfied the medical definition of intellectual disability. *See Briseno*, 135 S.W.3d at 8. Because *Briseno* incorporates considerations into the assessment of intellectual disability that are in direct conflict with the clinical/medical framework for evaluating intellectual disability, it is in tension with the Supreme Court's opinions in *Atkins* and *Hall*. Moreover, given this tension between Texas's standard in *Briseno* and the Supreme Court's holdings in *Atkins* and *Hall*, the very issue that is at the heart of appellant's complaint in this case—whether Texas's standard for evaluating claims of intellectual disability conforms with the requirements of the Eighth Amendment—is currently being reviewed by the Supreme Court in the case of

another Texas capital offender, Bobby James Moore. *See Ex parte Moore*, 470 S.W.3d 481 (Tex. Crim. App. 2015), *cert. granted sub nom*. *Moore v. Texas*, No. 15-797, 136 S. Ct. 2407 (pet. granted June 6, 2016). Given these considerations, in my view, it would be proper for this Court to delay resolution of this case until the Supreme Court issues its forthcoming opinion in *Moore* that will, in all likelihood, be issued in the next few months, given that that Court ordinarily decides its cases during the same term in which a case is heard. I explain my rationale by detailing the pertinent cases discussing intellectual disability in the chronological order of the decisions: *Atkins*, *Briseno*, *Hall*, *Moore*, and the instant case.

**A. The Supreme Court's Announcement of a Categorical Prohibition Against Executing Intellectually Disabled Offenders in *Atkins***

In *Atkins*, the Supreme Court held that it constitutes cruel and unusual punishment in violation of the Eighth Amendment to execute an intellectually disabled person. 536 U.S. at 307. The Supreme Court explained that, "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses, [such individuals] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Id.* at 306; *see also id.* at 320 (explaining that intellectually disabled people exhibit "cognitive and behavioral impairments that make [them] less morally culpable—for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses"). Looking to national trends in state legislation addressing the suitability of imposing the death penalty against intellectually disabled people, the Supreme Court observed that a large number of states had enacted legislation prohibiting the

execution of such individuals. *Id.* at 315-16. This trend, it explained, provided "powerful evidence that today our society views [intellectually disabled] offenders as categorically less culpable than the average criminal." *Id.* at 316. In further explaining its reasoning, the Supreme Court in *Atkins* indicated that the execution of intellectually disabled offenders was inconsistent with the penological purposes served by the death penalty. *Id.* at 318. It stated that such individuals

> frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. . . . [T]here is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* In light of these considerations, the Supreme Court observed that executing such offenders would advance neither the retribution nor deterrence purposes of the death penalty. *Id.* at 318-19. Construing the Eighth Amendment "in the light of our evolving standards of decency," the Supreme Court concluded that "such punishment is excessive and that the Constitution places a substantive restriction on the State's power to take the life" of an intellectually disabled offender. *Id.* at 321 (citations omitted).

Although it determined that a national consensus had emerged against the execution of intellectually disabled offenders, the Supreme Court recognized that, "[t]o the extent there is serious disagreement about the execution of [intellectually disabled] offenders, it is in

determining which offenders are in fact [intellectually disabled]." *Id.* at 317. Moreover, the Court indicated that "[n]ot all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus." *Id.* With these observations in mind, the Supreme Court stated that it would "'leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17 (1986)).

**B. This Court's Decision Implementing *Atkins* in *Ex parte Briseno***

Subsequent to *Atkins*, this Court in *Briseno* formulated its method for applying *Atkins*'s restriction on the execution of intellectually disabled offenders. *See Briseno*, 135 S.W.3d at 2. At the outset of its analysis in *Briseno*, this Court observed that it was necessary to set forth a judicially created standard to implement *Atkins* in the absence of legislative guidance as to the proper definition for assessing claims of intellectual disability. *Id.* at 4-5. The standard set forth in *Briseno* was intended to provide "temporary judicial guidelines" for addressing *Atkins* claims in the absence of legislation to implement the rule of that case. *Id.* at 5.

In closely examining the analysis in *Briseno*, as I explain more fully below, it appears that the Court's intention was to establish temporary guidelines that would address two matters. First, the three-pronged standard would address who was intellectually disabled under the medical criteria that was current at that time over a decade ago. Second, a court-

created legal standard that appears to have been interwoven into the second prong on adaptive deficits would be used to identify individuals who, although perhaps considered mildly intellectually disabled under the medical standard, would nevertheless be eligible for execution because they did not exhibit the degree of intellectual disability that would exempt them from the death penalty under *Atkins*. *Id.* at 8. In establishing those guidelines, this Court focused on the fact that the vast majority of people with intellectual disability fall into the range of having only a mild intellectual disability, as compared to those with moderate, severe, or profound intellectual disability. *Id*. at 5-6 (citing the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, also referred to as the DSM-IV, and observing that "85% of those officially categorized as [intellectually disabled] fall into the highest group, those mildly [intellectually disabled]"). This Court explained that those who might be considered intellectually disabled "encompass[ ] a large and diverse population suffering from some form of mental disability"; that intellectual disability is "not necessarily a lifelong disorder"; and that the functioning level of those who are mildly intellectually disabled is likely to improve with supplemental social services and assistance. *Id.* at 5-6. As an apparent explanation for why it might be proper to medically diagnose a person with mild intellectual disability but not abide by that diagnosis as a basis to classify that person as ineligible for the death penalty, this Court observed that it is "understandable that those in the mental health profession should define [intellectual disability] broadly to provide an adequate safety net for those who are at the

margin and might well become mentally-unimpaired citizens if given additional social services support." *Id*. at 6. To attempt to separate the wheat from the chaff to determine which people with borderline or mild intellectual disabilities could still be subject to the death penalty, this Court applied (1) medical criteria and (2) legal criteria.

**1. The Medical Criteria Under the Three General Prongs**

In *Briseno*, this Court indicated that, to determine whether an individual falls within the clinical definition of intellectual disability, it would rely primarily on the criteria employed by the American Association on Mental Retardation (AAMR) and the definition contained in section 591.003(13) of the Texas Health and Safety Code. *Id*. at 7.[1] Pursuant to those sources, intellectual disability is defined as (1) "significantly subaverage" general intellectual functioning, generally defined as an IQ of 70 or below; (2) accompanied by "related" limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. *Id*.

With particular respect to the adaptive-functioning prong of the inquiry, this Court stated that the relevant criteria are "exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases." *Id*. at 8; *see also id*. at 13 (suggesting that "determining what constitutes [intellectual disability] in a particular case varies sharply depending upon who performs the analysis and the methodology used"). In

---

[1] *See* TEX. HEALTH & SAFETY CODE § 591.003(7-a) ("'Intellectual disability' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period.").

making this observation, the Court appeared to suggest that it was this inherent subjectivity in the medical standard that necessitated resort to other, non-medical considerations that would permit a fact-finder to determine whether an offender falls within the scope of *Atkins*.

## 2. The Legal Criteria Used to Modify the Adaptive-Deficits Prong

In order to reflect the portion of *Atkins* that arguably suggested that some borderline intellectually disabled people might nevertheless be eligible for execution, it appears that this Court created a legal standard to identify those individuals who were medically or clinically determined to be intellectually disabled but who could nonetheless be eligible for execution because they fell outside the "range of [intellectually disabled] offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317. That legal standard was incorporated into and appeared to modify the second prong of the medical criteria addressing adaptive deficits.

In *Briseno*, this Court opined that, unlike the task of a mental-healthcare provider to provide services and support to intellectually disabled people, the legal question before the Court was to "define that level and degree of [intellectual disability] at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty." *Briseno*, 135 S.W.3d at 6. In addressing that question, the Court stated,

> Most Texas citizens might agree that Steinbeck's Lennie should, by virtue of his lack of reasoning ability and adaptive skills, be exempt. But, does a consensus of Texas citizens agree that all persons who might legitimately qualify for assistance under the social services definition of [intellectual disability] be exempt from an otherwise constitutional penalty? Put another way, is there a national or Texas consensus that all of those persons whom the mental health profession might diagnose as meeting the criteria for [intellectual disability] are automatically less morally culpable than those who

just barely miss meeting those criteria? Is there, and should there be, a[n] [intellectual disability] bright-line exemption from our state's maximum statutory punishment? As a court dealing with individual cases and litigants, we decline to answer that normative question without significantly greater assistance from the citizenry acting through its Legislature.

*Id*.

Although this Court suggested in *Briseno* that it was not setting forth a "bright-line" rule with respect to whether some mildly intellectually disabled offenders would nevertheless be eligible for execution, in practice the rule of *Briseno* has operated as a definitive rule that permits the execution of such individuals.  The legal criteria used in *Briseno* to determine which individuals with mild intellectual disability might still be subject to the death penalty were described by this Court as "some other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of [intellectual disability] or of a personality disorder."  Those seven factors are:

- Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was intellectually disabled at that time, and, if so, act in accordance with that determination?
- Has the person formulated plans and carried them through or is his conduct impulsive?
- Does his conduct show leadership or does it show that he is led around by others?
- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
- Can the person hide facts or lie effectively in his own or others' interests?
- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Id.* at 8-9.  Without citing any authority or explanation for the conception of these particular

factors as a basis for determining intellectual disability or assessing a person's adaptive deficits, this Court appears to have created the criteria out of whole cloth.

The insertion of the seven *Briseno* factors incorporating a subjective assessment of non-diagnostic evidentiary considerations to modify the three-pronged medical standard for intellectual disability has created a Frankenstein approach to determining intellectual disability in Texas. Due to the insertion of the unscientific *Briseno* factors into the adaptive-deficits prong for determining intellectual disability, Texas's standard implementing the categorical bar on executing intellectually disabled people is neither medical nor legal. The standard was a creation of this Court, incorporating part medical and part legal considerations to form a mutant standard for assessing intellectual disability that is disengaged from what the Supreme Court intended when it decided *Atkins*.

In all fairness to the *Briseno* Court, the standard announced in that case was intended to be a temporary solution until the Legislature could act to implement a permanent standard, and it made its decision thirteen years ago. The fault lies not with the *Briseno* Court but with today's Court that continues to apply that standard even after recent developments have called into doubt whether *Briseno* remains a viable standard for deciding claims of intellectual disability, given the Supreme Court's indication in its recent decision in *Hall* that any such determination must be closely tied to the current medical diagnostic criteria, rather than being based on the types of subjective, non-clinical considerations that this Court suggested were appropriate in *Briseno*.

**C.  Supreme Court's Reasoning in *Hall v. Florida* Suggests that Standard For Assessing Intellectual Disability Must Be Rooted In Current Medical Diagnostic Framework**

In *Hall*, the Supreme Court considered whether Florida's standard for evaluating claims of intellectual disability conformed to the substantive rule it had set forth in *Atkins*. *See Hall*, 134 S. Ct. at 1990.  The Florida rule had defined intellectual disability as requiring an IQ test score of 70 or less, and, if an offender had an IQ score of 70 or above, all further exploration of intellectual disability was foreclosed. *Id.*  The Supreme Court in *Hall* rejected this rule as being too "rigid" and as creating an "unacceptable risk that persons with intellectual disability will be executed." *Id.*  In explaining its reasoning, the *Hall* Court first acknowledged that courts and legislatures routinely "consult and are informed by the work of medical experts in determining intellectual disability[,]" and it unequivocally stated that, "[i]n determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions." *Id.* at 1993.  Applying that principle to Florida's rule, the Supreme Court observed that Florida's use of a strict IQ score cutoff was impermissible because it "disregard[ed] established medical practice" in two ways. *Id.* at 1995.  First, the Supreme Court noted that Florida's rule was incompatible with medical standards because it "takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence," including evidence of adaptive deficits. *Id.* Second, the Court explained that the rule was problematic because it "relies on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing

to recognize that the score is, on its own terms, imprecise." *Id.* The *Hall* Court observed that Florida's strict IQ score cutoff was questionable because the "professionals who design, administer, and interpret IQ tests have agreed . . . that IQ test scores should be read not as a single fixed number but as a range," based on the standard error of measurement (SEM). *Id.*

In ultimately rejecting Florida's rule as unconstitutional, the Supreme Court explained that *Atkins* "did not give the States unfettered discretion to define the full scope of the constitutional protection," but instead required states to incorporate current medical diagnostic standards in determining intellectual disability. *Id.* at 1998. In support, it reviewed those portions of *Atkins* that had cited clinical definitions of intellectual disability, which, "by their express terms, rejected a strict IQ test score cutoff at 70." *Id*. The Court further observed that "*Atkins* itself not only cited clinical definitions for intellectual disability but also noted that the States' standards, on which the Court based its own conclusion, conformed to those definitions." *Id.* at 1999. The Court stated,

> In the words of *Atkins*, those persons who meet the "clinical definitions" of intellectual disability "by definition . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Thus, they bear "diminish[ed] . . . personal culpability." The clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of *Atkins*.

*Id*. (quoting *Atkins*, 536 U.S. at 318). The Court thus interpreted *Atkins* as providing "substantial guidance on the definition of intellectual disability," and it further disavowed any suggestion that *Atkins* had bestowed upon the states complete autonomy to "define

intellectual disability as they wished," because, in that event, the Court's decision in *Atkins* "could become a nullity." *Id.*

In holding that Florida's statute, as interpreted by its courts, was unconstitutional, the Supreme Court indicated that its determination was "informed by the views of medical experts." *Id.* at 2000. Although it explained that those views did not "dictate the Court's decision," the Court would not "disregard these informed assessments." *Id.* It stated,

> It is the Court's duty to interpret the Constitution, but it need not do so in isolation. The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.

*Id.* The Supreme Court's reasoning in *Hall* thus clearly signaled that, to be constitutionally permissible, standards for assessing intellectual disability must be informed by the current diagnostic framework and may not disregard the medical community's informed assessments regarding what constitutes intellectual disability. *Id.*

As I explain more fully in Section II below, the *Briseno* standard fails to comport with these requirements, given that the standard set forth in that case relies heavily on the seven evidentiary factors which, as acknowledged by this Court, are not derived from the medical diagnostic framework, but instead resort to lay stereotypes regarding what constitutes intellectual disability. *See Ex parte Van Alstyne,* 239 S.W.3d 815, 820 (Tex. Crim. App. 2007) (describing *Briseno* evidentiary factors as "non-diagnostic"). This tension between

*Hall* and *Briseno* was discussed by this Court in *Moore*, and the Supreme Court's subsequent grant of certiorari in that case suggests that the apparent conflict between those cases is ripe for resolution.

**D.  *Ex parte Moore* and Subsequent Grant of Certiorari to Review Texas's Standard for Assessing Intellectual Disability**

In *Moore*, this Court's majority opinion indicated that, in spite of the Supreme Court's holding in *Hall*, it would continue to adhere to *Briseno* as the appropriate standard for deciding intellectual-disability claims under *Atkins*. *See Moore*, 470 S.W.3d at 486.  I dissented from that holding, and, in Section II below, I will discuss my dissenting opinion in that case.  In *Moore*, the habeas court had recommended that habeas relief be granted to Moore on the basis that he had proven his intellectual-disability claim in light of modern clinical standards as set forth by the American Association on Intellectual and Developmental Disabilities (AAIDD),[2] but this Court's majority opinion held that the habeas court's use of modern clinical standards was in conflict with *Briseno*.  This Court's majority opinion stated, "Because our Legislature has not enacted legislation to implement *Atkins*'s mandate, we continue to follow the AAMR's 1992 definition of intellectual disability that we adopted in *Briseno* for *Atkins* claims presented in Texas death-penalty cases . . . . The habeas judge therefore erred by disregarding our case law and employing the definition of intellectual disability presently used by the AAIDD[.]" *Id*.  This Court further explained,

---

[2]  This organization was formerly known as the American Association on Mental Retardation, or AAMR.

It may be true that the AAIDD's and [American Psychological Association's] positions regarding the diagnosis of intellectual disability have changed since *Atkins* and *Briseno* were decided. Indeed, we have recently discussed the subjectivity surrounding the medical diagnosis of intellectual disability and some of the causes for that subjectivity. *See* [*Ex parte*] *Cathey*, 451 S.W.3d at 10 & nn. 22–23. But although the mental-health fields and opinions of mental-health experts inform the factual decision, they do not determine whether an individual is exempt from execution under *Atkins*. *See id.* at 9–10 (stating that we must apply our own judgment on the appropriate ways to enforce the ultimately legal prohibition on executing intellectually disabled offenders). . . . We conclude that, at this juncture, the legal test we established in *Briseno* remains adequately "informed by the medical community's diagnostic framework." *See Hall v. Florida*, —— U.S. ——, 134 S.Ct. 1986, 2000, 188 L.Ed.2d 1007 (2014).

*Id.* at 486-87. In rejecting the habeas court's recommendation to grant relief on Moore's *Atkins* claim, this Court's majority opinion held that the habeas court had failed to conduct a proper "relatedness inquiry" by inadequately considering *Briseno*'s seven evidentiary factors. *Id.* at 488-89 (citing *Briseno*, 135 S.W.3d at 8-9). This Court's majority opinion further indicated, with respect to the adaptive-functioning prong, that a court should consider "*all* of the person's functional abilities," including "those that show strength as well as those that show weakness." *Id.* at 489. It held that the habeas court had erred to the extent that it "considered only weaknesses in applicant's functional abilities." *Id.* After applying *Briseno* to the facts of Moore's case, this Court's majority opinion rejected the habeas court's recommendation that had found Moore to be intellectually disabled, and this Court denied relief. *Id.*

Moore sought review of that decision by filing a petition for a writ of certiorari in the Supreme Court, which was granted. *See Moore v. Texas*, No. 15-797 (pet. granted June 6,

2016, argued Nov. 29, 2016).  Moore's case remains pending in the Supreme Court.  The question before the Supreme Court in *Moore* is "whether it violates the Eighth Amendment and this Court's decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014) and *Atkins v. Virginia,* 536 U.S. 304 (2002) to prohibit the use of current medical standards on intellectual disability, and require the use of outdated medical standards, in determining whether an individual may be executed."

In his arguments to the Supreme Court, Moore contends that *Atkins* and *Hall* require a state's standards for evaluating intellectual disability to be "informed by the medical community's diagnostic framework" and that a state's determination may not "go against the unanimous professional consensus" or "disregard established medical practice."  He contends that this Court's approach in *Briseno* conflicts with *Atkins* and *Hall* by "prohibit[ing] consideration of current medical standards when evaluating the constitutionality of executing an individual who claims intellectual disability," and he further challenges *Briseno*'s adoption of additional evidentiary considerations that are not rooted in the medical-diagnostic framework and thus are "clinically unsound."  He states,

> [This Court's] determination that Texas courts must not consider current medical standards—and must instead use its *Briseno* framework of superseded medical standards and non-clinical factors—runs headlong into [the Supreme Court's] decisions. . . . It is a conspicuous outlier among state and federal courts considering intellectual disability, and squarely presents the deeply troubling prospect that intellectually disabled individuals . . . will be executed in violation of their Eighth Amendment rights.

Moore states that, just as there would be no valid medical reason for a clinician to make a

diagnosis of intellectual disability based on outdated or unscientific standards, there is no valid legal reason for a court to use such a standard in evaluating a claim under *Atkins*. He suggests that the difference between the outdated diagnostic standard and the current standard is significant, in that the current standard places a greatly reduced emphasis on IQ scores in the assessment of intellectual functioning and relies more heavily on an assessment of adaptive functioning. As to adaptive functioning, Moore observes that, under the current clinical definition of intellectual disability set forth in the DSM-5, adaptive deficits should not be balanced or offset against perceived adaptive strengths in other areas. He further contends that the DSM-5 "explicitly recognizes the difficulty in assessing deficits in adaptive functioning in highly controlled settings such as prisons." Moreover, he contends that both the DSM-5 and the current AAIDD standards take the position that "street smarts, behavior in jail or prison, or criminal adaptive functioning" should not be used to infer levels of adaptive behavior.

Further, to the extent that this Court had discounted Moore's evidence of deficits in adaptive functioning based on a determination that those deficits were "caused by a variety of [other] factors," including his troubled childhood and history of adolescent drug use, Moore contends that this analysis "completely disregarded current clinical guidance that environmental challenges and other disorders can, and frequently do, coexist with and contribute to intellectual disability." He states that this Court's approach was flawed because it

treated risk factors and associated features of intellectual disability which support its diagnosis under clinical standards as refuting a diagnosis here. . . . Thus the very factors that the CCA used to dispense with Moore's diagnosis of intellectual disability, actually support, under current medical standards, a diagnosis of intellectual disability . . . . By requiring Moore to prove that his deficits in adaptive functioning were caused specifically and exclusively by his intellectual deficits—where there is no such requirement in clinical guidelines and where the clinical guidance suggests that the unrelated factors, in fact, support a diagnosis of intellectual disability—[this Court] created an unacceptable risk that persons with intellectual disability will be executed.

In sum, Moore's arguments to the Supreme Court challenge both this Court's refusal to consider current medical standards in evaluating claims of intellectual disability and its adherence to the *Briseno* evidentiary factors that are "inconsistent with clinical standards," based on impermissible lay stereotypes, and inject "unsound non-clinical criteria into Texas's diagnostic framework for assessing intellectual disability." As shown below, Moore's contention that the *Briseno* standard is incompatible with the requirements of the Eighth Amendment as set forth in *Atkins* and *Hall* due to that standard's failure to reflect current medical diagnostic standards is essentially the same as the contention raised by this appellant in his direct appeal, in which he argues that this Court should cease its adherence to the *Briseno* standard.

### E. Appellant's Arguments in his Brief Are Encompassed Within the Issue Pending in *Moore*

Because the Supreme Court's opinion in *Moore* is imminent, and because the issues to be resolved in that case are directly relevant to appellant's arguments in the instant case, I would not resolve appellant's direct appeal until this Court has the benefit of the Supreme

Court's forthcoming decision in *Moore*.

Similar to the arguments that Moore has presented to the Supreme Court, in his brief in this direct appeal, appellant challenges the *Briseno* standard's use of "other evidentiary factors" that are untethered from the medical/clinical definitions of intellectual disability. *See Briseno*, 135 S.W.3d at 8. He states that these other factors were created "[s]eemingly from whole cloth, and without scientific, clinical, or other authority[.]" He further asserts that this Court "routinely applies the *Briseno* factors instead of clinical diagnostic criteria to evaluate intellectual disability." And, he suggests, *Hall* confirmed that "clinical standards were a fundamental premise of *Atkins*" and must form the basis of any assessment of intellectual disability. As in *Moore*, appellant contends that Texas's current standard departs from clinical standards "by disregarding a defendant's adaptive deficits if the defendant also exhibits adaptive strengths and by giving effect to lay stereotypes of how intellectually disabled persons ought to appear to behave." In particular, he notes that, contrary to the *Briseno* standard, under clinical standards, observed limitations in one area cannot be outweighed by potential strengths in other unrelated areas. Thus, he suggests, under clinical standards, meeting minimum thresholds for deficits properly yields a diagnosis of intellectual disability, regardless of whether a defendant is competent in other adaptive domains.[3]

---

[3]  As appellant notes, strengths in an area in which the defendant claims to have limitations are clinically relevant. *Clark v. Quarterman*, 457 F.3d 441, 447 (5th Cir. 2006). But "[b]ecause limitations define [intellectual disability], adaptive strengths are relevant only insofar as they offset particular adaptive weaknesses." Blume et al., *Of Atkins and Men*, 18 CORNELL J.L. & PUB. POL'Y 689, 707 (2009).

Further, appellant contends that, by giving effect to lay opinions that rely on stereotyping, the *Briseno* standard frequently means that "*Atkins* cases in Texas . . . turn on testimony from individuals with no clinical training about whether they personally considered the defendant" intellectually disabled. Several of the *Briseno* factors, he asserts, are "not factors considered in any known clinical assessments." In sum, he opines that this Court has not complied with *Atkins* or *Hall* by continuing to rely on a "nonclinical approach to uphold death sentences when defendants concededly meet the clinical definition of intellectual disability." He contends that "no other state legislature or court has devised its own nonclinical evidentiary factors to govern the evaluation of adaptive functioning for *Atkins* purposes." He argues that this Court, by continuing to apply *Briseno*, "systematically departs from the clinical norms that govern *Atkins* claims in the vast majority of other States by giving dispositive weight to factors that have no scientific grounding."

By comparing the arguments presented in appellant's brief with the arguments Moore has presented to the Supreme Court, it should be apparent that the issue pending in *Moore* is directly germane to the resolution of appellant's complaint in this case. There can be little doubt that the Supreme Court's ruling will constitute new law that will apply to appellant's case. Accordingly, given all of the foregoing considerations that suggest, at best, that Texas's standard for evaluating intellectual disability is in flux, I would delay resolution of this appeal until this Court receives a ruling as to whether the *Briseno* standard remains viable at this juncture.

**II.  Alternatively, Texas's Standard for Intellectual Disability is Unconstitutional**

Because the *Briseno* standard relies heavily on the seven evidentiary factors which are not derived from the medical diagnostic framework and instead are based on lay stereotypes and subjective considerations regarding what constitutes intellectual disability, I conclude that the Texas standard for determining intellectual disability is unconstitutional.  *Compare Hall*, 134 S. Ct. at 1999 (confirming that "clinical definitions of intellectual disability . . . were a fundamental premise of *Atkins*"), *with Van Alstyne,* 239 S.W.3d at 820 (describing *Briseno* evidentiary factors as "non-diagnostic").  I would entirely abandon the *Briseno* standard employed by this Court to determine intellectual disability.

As I stated in my dissenting opinion in *Moore*, "it is time for Texas to reevaluate the decade-old, judicially created standard in *Ex parte Briseno* in light of a shift in the consensus of the medical community regarding what constitutes intellectual disability, and in light of the Supreme Court's recent holding in *Hall v. Florida* indicating that courts are required to consider that consensus in assessing intellectual-disability claims*." See Moore*, 470 S.W.3d at 528 (Alcala, J., dissenting); *Hall*, 134 S. Ct. at 1993.  In my *Moore* dissent, I suggested that this Court "should take this opportunity to modify the *Briseno* test to require a bifurcated inquiry" consisting of a separate medical and legal test for intellectual disability.  *Moore,* 470 S.W.3d at 530.  Since I made that suggestion, however, I have, upon further reflection, revised my position, and I now conclude that this Court should limit itself to a single inquiry that is rooted solely in medical/clinical considerations.  In my *Moore* dissent, I described that

medically-based inquiry as a determination "whether a defendant is intellectually disabled based on the current standards employed by the medical community in the manual of the American Association on Intellectual and Developmental Disabilities." *Id*. Furthermore, in my *Moore* dissent, I said, "Because this Court's majority opinion continues to apply the former medical standard that was in effect in 2004, rather than the prevailing views held by the medical community today, I would modify this portion of *Briseno* to reflect the current standards." *Id*.

In no circumstances would I permit the commingling of medical criteria with non-medical criteria to ascertain who is intellectually disabled. I concluded in my dissenting opinion in *Moore* that "the *Briseno* Court's decision to place a legal standard into the medical criteria for establishing adaptive deficits produced an unscientific standard that is inconsistent with the requirement that any standard be informed by current medical criteria." *Id*. at 536-37. I, therefore, suggested that this Court should adopt a standard that would not commingle the seven *Briseno* factors with the three-prong medical test for establishing intellectual disability.

In an effort to salvage some of this Court's reasoning that gave rise to the seven *Briseno* evidentiary considerations, in my *Moore* dissent I compared those factors to the adaptive-deficits prong of the clinical inquiry, and I reiterate today that some of the evidentiary considerations set forth in *Briseno* appear to attempt to correlate with the adaptive-deficits prong. *Id*. But, upon further reflection since *Moore*, it seems clear to me

that the seven *Briseno* factors do more harm than good and thus should not form any part of this Court's assessment of intellectual-disability claims. By allowing a fact-finder to override clinical considerations based on immaterial and stereotypical views of how an intellectually disabled person should behave, the seven *Briseno* factors muddle what should be a three-pronged inquiry based on the current medical diagnostic framework. The inquiry should be whether the evidence proves that a person is intellectually disabled under a proper medical standard, and, if it does, then *Atkins* and *Hall* require that the person be categorically exempt from the death penalty. *See Atkins*, 536 U.S. at 304; *Hall*, 134 S. Ct. at 1999.

Having determined that current medical standards should be employed to decide intellectual disability in this context and that the seven *Briseno* considerations should be removed from the medical standard, all that remains to be decided is whether each state may apply its own legal standard for purposes of deciding who among those people who are intellectually disabled may nonetheless be subject to the death penalty. Although some of the discussion in *Atkins* and *Hall* appears to suggest that states may have some leeway in creating their own legal standards, I am no longer convinced that a state may create a legal standard that would permit the death penalty for someone who is considered intellectually disabled under the medical standard. In *Atkins*, the Supreme Court said that "[n]ot all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus" against the imposition of the death penalty. *Atkins*, 536 U.S. at 317. Furthermore, in *Hall*, the Supreme

Court stated that the "legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Hall*, 134 S. Ct. at 2000. I recognize that these statements could be interpreted as suggesting that states have some discretion to create a legal standard permitting the death penalty against some people who have a mild intellectual disability, as determined by the medical/clinical framework. But I cannot reconcile these statements that might appear to permit the execution of someone who is intellectually disabled under current medical standards, given the Supreme Court's clear categorical holding that a person who is intellectually disabled is not subject to the death penalty, and given the Court's more recent suggestion in *Hall* that a state's standard for assessing intellectual disability may not "disregard[ ] established medical practice." *See Hall*, 134 S. Ct. at 1995. Drawing a fine line between constitutionally permissible imposition of the death penalty against some intellectually disabled people while prohibiting it against others who fit the medical/clinical criteria—as some of the Supreme Court's statements may appear to suggest might be permissible under a legal standard and as this Court has done in its *Briseno* standard—seems arbitrary and internally contradictory with the clear-cut holding that an intellectually disabled person is categorically exempt from the death penalty. In any event, I would not draw that fine line with a judicially created guideline. Rather, I would hold that once a defendant has shown that he is intellectually disabled under current medical standards, the death penalty is categorically barred. The best scenario, of course, would be for the Texas Legislature to formulate a standard for deciding

intellectual-disability determinations in the context of capital murder cases, as long as it acted in accordance with Supreme Court precedent. But, in the absence of such guidance, I would not continue to apply a court-made standard that permits the execution of some mildly intellectually disabled offenders, particularly given the serious questions that have arisen regarding whether that legal standard comports with the Eighth Amendment.

As I stated in my *Moore* dissent, "I do not attempt to formulate a precise standard to replace the now-outdated *Briseno* standard. Any new or revised standard ultimately should be made by the Legislature, but until then, in the absence of statutory guidance, a new standard should be developed by a majority of the judges on this Court, and taking into account the informed view of a consensus of the medical scientific community." *Moore*, 470 S.W.3d at 543. Consistent with this view, I would not apply *Briseno* to appellant's case, but would instead hold that that standard is unconstitutional. Accordingly, I would consider the merits of his claim under a revised standard that reflects the current medical diagnostic framework.

### III.  Conclusion

The same standard that is currently being reviewed by the Supreme Court as being possibly in violation of the Eighth Amendment is the one applied by the majority opinion in this case. For all of the foregoing reasons, rather than hastily resolve this case without receiving guidance from the Supreme Court on a crucial matter of constitutional law that is directly relevant to appellant's case, I would withhold resolution of this case in the interim.

Alternatively, I would hold that the Texas standard for determining intellectual disability as articulated in *Briseno* is unconstitutional, and I would determine whether appellant is intellectually disabled under a constitutional standard that is informed by current medical standards and that does not resort to consideration of the unscientific *Briseno* factors. Because the Court upholds appellant's sentence of death through application of the *Briseno* standard, I respectfully, dissent.

Filed: March 8, 2017

PUBLISH